**Gordon PASCU, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 3004.**

Supreme Court of Alaska.

May 5, 1978.

1. *See* AS 22.30.

Michael W. Sewright, Edgar Paul Boyko & Associates, P. C., Anchorage, for appellant.

Rhonda F. Butterfield, David Shimek, Asst. Dist. Attys., Harry L. Davis, Dist. Atty., Fairbanks, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

OPINION

Before BOOCHEVER, C. J., and CON-
NOR, BURKE and MATTHEWS, JJ., and
DIMOND, J. Pro Tem.

BURKE, Justice.

This appeal concerns the defense of en-
trapment.

On November 25, 1975, Gordon Pascu sold
one half ounce of heroin to Phillip Geiger
and James Blair. Geiger and Blair were
police agents.[1] Pascu, as a result of that
transaction, was indicted for sale of a nar-
cotic drug in violation of AS 17.10.010.

Following his indictment, Pascu's attor-
ney sought a pre-trial hearing on his claim
of entrapment.[2] That request was granted
and the hearing was held before the Honor-
able Jay A. Rabinowitz, justice of the Su-
preme Court of Alaska, sitting, by assign-
ment, as judge of the Superior Court. Af-
ter the presentation of Pascu's evidence, the
state requested a ruling on the sufficiency
of his showing of entrapment before calling
its own witnesses. Justice Rabinowitz
ruled that such evidence was not sufficient
to establish the defense. Following his la-
ter conviction before another judge and the
entry of a final judgment, Pascu appealed.

I

██ On appeal, Pascu first contends that
Justice Rabinowitz erred in denying his
claim of entrapment. We agree and re-
verse his conviction on that ground.

1. Geiger was apparently a modern version of
the legendary bounty hunter. After being in-
dicted on multiple counts for sale and posses-
sion of narcotic drugs, Geiger entered into an
agreement with the Fairbanks District Attor-
ney's office. By the terms of the agreement,
Geiger was given sixty days to obtain evidence
against no less than six other individuals, with
which those individuals could be charged with
narcotics violations. In return, it was agreed
that all but one of the charges against Geiger
would be dismissed. On the remaining charge
he agreed to plead guilty in return for a recom-
mendation of leniency. In further considera-
tion of Geiger's services, the state agreed to
dismiss all but one of several similar charges
pending against his girlfriend, Kathy Blair.

In *Grossman v. State*, 457 P.2d 226, 227
(Alaska 1969), we noted that "the underly-
ing basis of [the defense of] entrapment is
found in public policy," quoting Judge
Learned Hand's remarks in *United States v.
Becker*, 62 F.2d 1007, 1009 (2d Cir. 1933),
"The whole doctrine derives from a sponta-
neous moral revulsion against using the
powers of government to beguile innocent,
though ductile, persons into lapses which
they might otherwise resist." Adopting an
"objective test," we held, in *Grossman*, that
permissible inducements on the part of law
enforcement officials "should be limited to
those measures which, objectively con-
sidered, are likely to provoke to the commis-
sion of crime only those persons, and not
others, who are ready and willing to commit
a criminal offense." 457 P.2d at 229. We
described the objective test as follows:

[U]nlawful entrapment occurs when a
public law enforcement official, or a per-
son working in cooperation with him, in
order to obtain evidence of the commis-
sion of an offense, induces another person
to commit such an offense by persuasion
or inducement which would be effective
to persuade an average person, other
than one who is ready and willing, to
commit such an offense. Conversely, in-
stigations which would induce only a per-
son engaged in an habitual course of un-
lawful conduct for gain or profit do not
constitute entrapment.

*Id.* (footnote omitted).[3]

██ Since announcing our decision in
*Grossman* we have come to realize that

James Blair was not actually a party to the
agreement. However, the record clearly dem-
onstrates that he was working with Geiger and
under the supervision of the police. Thus, he
too must be considered a police agent.

2. In *Grossman v. State*, 457 P.2d 226, 230
(Alaska 1969), we held "that the issue of en-
trapment can be litigated either before or dur-
ing trial and should be determined by the court
and not the jury."

3. In *Grossman* we gave certain examples of
what might constitute activity amounting to
entrapment depending upon the particular cir-
cumstances involved: extreme pleas of desper-
ate illness, appeals based primarily on sympa-

there are certain difficulties in applying the foregoing standard. An "average person" probably cannot be induced to commit a serious crime except under circumstances so extreme as to amount to duress. Yet it is clear that entrapment may occur where the degree of inducement falls short of actual duress. What is prohibited, by *Grossman*, is unreasonable or unconscionable efforts on the part of the police to induce one to commit a crime so that he may be arrested and prosecuted for the offense. In determining whether entrapment has occurred, the trial court must focus "upon the particular conduct of the police in the case presented." 457 P.2d at 226. The question is really whether that conduct falls below an acceptable standard for the fair and honorable administration of justice.

■ With these basic principles in mind we turn to the facts in the instant case.[4]

Pascu, a heroin addict, testified that he had known Blair for four or five years, and that they were good friends. On November 25, 1975, Blair contacted him and asked Pascu to buy heroin for him. According to Pascu, Blair "said that he was sick and that he needed a fix."[5] At that time Blair appeared to Pascu to be undergoing narcotics withdrawal. Blair also told Pascu that he had a friend who was "very sick . . sicker than he was." Pascu refused Blair's plea for help. He testified that he told Blair that he was "pretty much in the same boat," in that he was trying to stop using heroin himself, "was feeling sick too,"[6] and that he didn't think he should obtain heroin

for Blair.[7] When asked what Blair's reaction was, Pascu testified, "He was quite upset. He was very agitated because he said he'd had a whole day of looking for heroin, and not being able to find any, and that he had been sick when he woke up."

According to Pascu, Blair continued with his efforts to persuade Pascu to obtain heroin for him, doing so "a number of times"; he reminded Pascu that they had been friends for a long time and that he had done similar favors for Pascu in the past when Pascu had been "sick."[8] Pascu testified:

I explained to him that I was trying to clean up, and that I didn't want to put myself up front, and expose myself to heroin; that it would be pretty hard for me to stay away from it. And he again asked me, and he reminded me that we'd been friends for a number of years, and that he had done me a lot of favors in the past, and he thought it was very cold-blooded of me not to—not to at least try to get him something. . . . And he did this two or three more times.

Blair also offered Pascu a share of the heroin, sufficient to alleviate Pascu's own withdrawal pains:

Blair . . . said that I looked sick, and he said I could probably use a hit of dope, and that he would give me a hit of dope, if I would do that. And then he went on to say that he would give me enough to get down, and enough for tomorrow morning, which was the next day

---

thy, pity or close personal friendship, and offers of inordinate sums of money. 457 P.2d at 230.

**4.** Of course the "facts" at this point in time and derived entirely from the evidence presented by the defense, since the state has not yet presented its evidence on the issue of entrapment. If and when the state has the opportunity to present contrary evidence, the true facts may prove to be entirely different. The resolution of any conflicts in the evidence will be a matter for the trial court.

**5.** "Sick" is a term used by those in the drug culture to describe one suffering withdrawal

symptoms. A "fix" is a shot of heroin. To "get well" means to "shoot enough heroin to take away the withdrawal—to get high."

**6.** Earlier Pascu testified that he was "trying very hard" to stop using drugs and was suffering from withdrawal.

**7.** Pascu indicated that he feared that if he exposed himself to heroin he would not be able to resist the temptation to resume use of the drug.

**8.** Pascu explained that when he had been "sick," Blair had supplied him with the heroin he needed to relieve his withdrawal symptoms.

. . . . [I]t would be worth roughly $200.00 [9]

Eventually, Pascu yielded and entered into the transaction leading to his indictment and conviction.

We hold that the evidence presented was sufficient to establish the defense of entrapment, and that Justice Rabinowitz erred in ruling to the contrary. We believe such evidence, viewed objectively, shows a degree of inducement going well beyond the limits of permissible police conduct described in *Grossman v. State, supra.* Thus, Pascu's conviction must be reversed.

It is quite clear from the record before us that Blair played heavily on his close personal friendship with Pascu, making repeated appeals to Pascu's sense of obligation and sympathy. In addition, Blair took advantage of Pascu's own addiction and withdrawal pains by offering to give him enough heroin to "make him well." [10]

■ We are firmly convinced that law enforcement officials can, and often must, employ deceptive measures in order to detect and apprehend those engaged in criminal conduct, particularly in the area of narcotics. Thus, it is quite proper for the police to provide the opportunity for one engaged in criminal activities to ply his trade. *See, e. g., McKay v. State, supra* note 10. However, we also subscribe to the view that officials cannot "implant in the mind of an innocent person the disposition

to commit the alleged offense and induce its commission in order that they may prosecute." *Sorrells v. United States*, 287 U.S. 435, 442, 53 S.Ct. 210, 212, 77 L.Ed. 413, 417 (1932).[11] "[U]nder standards of civilized justice, there must be some control on the kind of police conduct which can be permitted in the manufacture of crime." *Grossman v. State, supra* at 230.

■ In order to allow the state an opportunity to present its evidence on the issue of entrapment, this matter is remanded to the superior court. After hearing such evidence as may be presented, the superior court shall resolve any factual conflicts that may arise as a result of that evidence, and thereafter redetermine the issue of entrapment.[12]

## II

■ We do not reach Pascu's second contention on appeal, namely, that his sentence was excessive.[13] If the state is unable to overcome Pascu's own evidence of entrapment, his indictment must be dismissed. In that event the matter of the severity of his sentence will become moot. On the other hand, if the state is able to rebut Pascu's claim of entrapment, the additional evidence presented may very well establish that Pascu sold heroin under circumstances quite different from those shown by the evidence that is presently

9. Although Pascu indicated that he could also have made a $300 monetary profit in the transaction, there was no evidence that Blair actually offered him any such amount.

10. We think this case is clearly distinguishable from *McKay v. State*, 489 P.2d 145 (Alaska 1971). There we held that entrapment had not been established by evidence that an undercover police officer represented himself to be a "big man in narcotics," offered the defendant a fifty-fifty split of the profits in a marijuana sale worth $10,000, and said he had a friend who was addicted and needed heroin badly. Unlike Pascu and Blair, the officer and the defendant in that case were not close friends. Noting that after mentioning his "strung out friend" the officer did not emphasize that fact further, and the fact that drug sales commonly involve large profits, we rejected the defendant's claim of entrapment, concluding that there was "[a]

strong inference . . . that [he] was ready and willing to engage in the drug transactions wholly independent of [the officer's] pleas to his humanitarian and pecuniary motives." The evidence in this case just as strongly suggests an opposite inference.

11. In *Grossman, supra* at 229, we rejected the subjective test enunciated in *Sorrells*. Thus, *Sorrells* is quoted here simply to describe what we consider to be impermissible police conduct.

12. The accused must carry the burden of establishing the defense of entrapment by a preponderance of the evidence. *Batson v. State*, 568 P.2d 973, 978 (Alaska 1977).

13. Judge J. Justin Ripley sentenced Pascu to a five year term of imprisonment.

before us. Thus, we believe that his culpability can be better determined at that time.[14]

REVERSED and REMANDED.

MATTHEWS, Justice, concurring.

I agree with the majority that the average man standard of *Grossman v. State,* 457 P.2d 226 (Alaska 1969) requires modification and that what is sought to be prevented by the defense of entrapment is unreasonable or unconscionable police conduct. I would particularize this somewhat by adding that in drug sales it is neither unconscionable nor unreasonable for a police agent to behave as an ordinary buyer. The police should be allowed to provide stimuli to induce a drug sale which are like those which a seller normally encounters. It may not be unusual for a buyer of illegal drugs to claim, or for a seller to require a buyer to claim, dire physical need for drugs. If that is the case a police agent ought to be able to feign a drug need. In such cases the inquiry should be whether the persuasion employed by the police is significantly greater than that generally encountered for similar transactions. This approach has been employed in a number of California cases;[1] its advantage is that it does not permit drug sellers to insulate themselves from conviction by the device of requiring all their customers to grovel briefly before a sale is made.

In this case there was but one short conversation which lead to the sale. The trial judge had the opportunity to judge the demeanor of the witnesses and he was not required to believe all that he heard. For these reasons I am not persuaded that we are justified in ruling as a matter of law that the defense of entrapment was made out. However, in light of the modified standard expressed in this opinion, I would remand to the superior court for a rehearing.

DIMOND, Justice Pro Tem, concurring.

I agree with the majority in holding that the evidence presented was sufficient to establish the defense of entrapment. But I am hesitant to accept the court's statement that "We are firmly convinced that law enforcement officials can, and often must, employ deceptive measures in order to detect and apprehend those engaged in criminal conduct, particularly in the area of narcotics."

In the course of pursuing those engaged in traffic in drugs, it is a wide-spread and almost standard procedure for the police to utilize the services of one against whom criminal charges may be brought or are pending. In exchange for immunity against prosecution, and at times with some monetary inducement, such a person buys drugs from those who are able to procure and sell them and then informs against those persons in subsequent criminal prosecutions.

This procedure may be of value in obtaining convictions for drug related offenses. But the means of achieving this is of dubious justification. The difficulty I have with this type of law enforcement is that it is based almost wholly on lies and deceit.

I believe it is essential to have objective morality and ethics in law, because this is essential to the "civilized justice" that the majority refers to. If I am correct, then it is repugnant to that concept to justify the apprehension of criminals on the basis that the end justifies the means—i. e., that it is proper to utilize the tools of lies and deceit to effect criminal justice. In my opinion,

14. Although not required to do so, the superior court may also reconsider its sentence in the light of such additional evidence. If warranted the sentence could be reduced. However, it could not be increased, as such an increase would violate Pascu's constitutional right against double jeopardy. *Sonnier v. State,* 483 P.2d 1003 (Alaska 1971). This observation, however, should not be taken as indicating any present belief on our part that Pascu's sentence was too severe.

1. *E.g., People v. Braddock,* 41 Cal.2d 794, 264 P.2d 521, 525 (1953); *People v. Woolwine,* 258 Cal.App.2d 385, 65 Cal.Rptr. 672, 676 (1968); *People v. Ramos,* 146 Cal.App.2d 110, 303 P.2d 783, 784 (1956); *People v. Gonzales,* 136 Cal. App.2d 437, 288 P.2d 588, 589 (1955).

this means of obtaining a desired end is distasteful and objectionable, because it eventually undermines, rather than enhances, the high standards of conduct in the administration of justice required of law enforcement agencies and the courts of this state.