[Crim. No. 20840. First Dist., Div. Two. June 12, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
SUSAN LESLIE ALLISON, Defendant and Appellant.

**COUNSEL**

Gordon L. Rockhill, Rockhill & Schaiman and Michael P. Goldstein for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Clifford K. Thompson, Jr., and Morris Lenk, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ROUSE, J.**—Defendant, Susan Allison, was convicted by a jury of selling or offering to sell cocaine, in violation of section 11352 of the Health and Safety Code. She appeals from an order placing her on probation for three years, subject to the condition that she serve five months in the county jail.

The case for the prosecution was based primarily upon the testimony of Frank Dixon and Steven Berch, two law enforcement officers who, at all pertinent times, were working as agents for the Santa Clara County Narcotics Bureau Task Force. Dixon testified that a week or two prior to April 10, 1978, a confidential reliable informant introduced him to John Harrington, the operator of a bicycle shop in Sunnyvale. Harrington offered to assist Dixon in his narcotics investigations by arranging for Dixon to meet any person with whom Harrington came in contact who had a substantial amount of cocaine for sale.

On April 10, 1978, Harrington telephoned Dixon and stated that he had arranged for Dixon to meet with two individuals who had a substantial amount of cocaine for sale. Harrington told Dixon to come to the bicycle shop at 5:30 p.m. that day and to bring with him sufficient funds to purchase at least eight ounces of cocaine.

Agents Dixon and Berch went to the bicycle shop at 5:30 p.m., and Harrington introduced them to defendant Allison and an individual named Robert Longstreet. Dixon acknowledged to Longstreet that he and Berch were looking for some cocaine to buy. Dixon suggested that the negotiations be conducted at a motel called the Sunnyvale Inn, where he had reserved a room. Longstreet and defendant Allison agreed, and, together with the two narcotics agents, left the bicycle shop and proceeded to the motel. As a result of negotiations, which took place over a period of some five hours, it was ultimately agreed that Dixon and Berch would purchase eight ounces of cocaine for $16,000. The transaction was to be accomplished in several installments, where-

by the agents would pay for and receive some two to six ounces of cocaine at a time and Longstreet would then return to his supplier and obtain more cocaine. While the first such delivery was being made, Dixon gave a prearranged signal to certain other officers stationed in another motel room. Longstreet and defendant were arrested, and a quarter ounce of cocaine was seized.

Agent Dixon testified that, although the bulk of the negotiations concerning the drug transaction were conducted by Longstreet, Allison was also an active participant. Dixon stated that at an early stage in the negotiations, when Longstreet had asked that the agents put up $2,000 before receiving any cocaine, Allison urged them to go ahead with the purchase, stating, "I always do my dope deals this way." She later made a similar statement, urging the agents to "[G]o ahead and do it. It is all right." She also suggested that if Dixon would give Longstreet $2,000 and allow him to leave the motel to obtain the cocaine, she would serve as security by remaining at the motel with the agents. When Longstreet did leave the motel at one point, defendant remained and told the agents that she wanted the sale to take place because she had been promised that she would receive eight grams of cocaine. Also, she stated that if Longstreet was unable to provide the cocaine, she had another connection in San Francisco, although the quality of the cocaine which she could obtain from that source would not be as good as Longstreet's.

Agent Berch also testified to defendant's statements concerning the high quality of Longstreet's cocaine and the fact that she knew of another cocaine source in San Francisco.

Bruce Rogers, who testified for the defense, was a 17-year-old high school student at the time of the events which resulted in defendant's arrest. Defendant, who was 21 years old at the time, was Rogers' aunt. Rogers testified that he was a good friend of John Harrington, the owner of the bicycle shop in Sunnyvale. Rogers was a steady customer at the shop, was very interested in bicycles and frequently had lengthy conversations with Harrington at the shop. Rogers testified that, sometime during the week prior to April 10, 1978, Harrington told him that he was in bad financial trouble, that he had obtained a loan on his house in order to purchase the bicycle shop and that he was presently about to lose his house, his shop or both, unless he could raise some money immediately. According to Rogers, Harrington said that he had thought of a way to solve his problems by purchasing a substantial

amount of cocaine and selling it at a profit. Harrington asked Rogers if he could help him find a source of cocaine.

Rogers decided to seek help from his aunt, defendant Allison. Rogers explained that he had a very close relationship with her and thought that, since she was living in San Francisco and attending San Francisco State University, she might possibly know someone who could help Harrington obtain cocaine. Rogers telephoned defendant, informed her of Harrington's problem and asked if she could help him find some cocaine. Defendant stated that she did not think that she could help him, but would try. Later the same day, Rogers made a second telephone call to defendant and asked her if she had received a call from Harrington. She said that she had, but again told Rogers that she did not think that she could help him.

Defendant also testified and stated that when her nephew, Rogers, initially telephoned her, he indicated that his friend, Harrington, was in a "life-and-death" situation, had mortgaged his home and was in danger of losing his business. When defendant asked Rogers why he had turned to her for help, he stated that he trusted her and that she was older than he was and in college. Defendant told her nephew that she did not think that she could help him; however, she felt sympathetic and "put on the spot," since Rogers was asking her to assume responsibility for his friend's welfare.

Defendant testified that approximately 15 minutes after the call from Rogers, Harrington telephoned her, discussed his financial problems and indicated that Rogers had said that she might be able to help him. Harrington told defendant that she was his last resort. Defendant then received a second call from Rogers, who again told her how important it was for her to help.

Defendant testified that after she had received these calls from Rogers and Harrington, she sought to contact someone who might know where to purchase cocaine. After making several unsuccessful calls, she thought of Robert Longstreet, a casual acquaintance whom she had encountered at parties. She had heard him talk of cocaine and had once seen him use it at a party. Defendant called Longstreet and told him that she had a friend who needed to purchase half a pound of cocaine. Longstreet replied that he did not know where to obtain such a large amount of cocaine.

According to defendant, she continued to receive numerous telephone calls from Harrington. He called her three or four times a day, and, on April 10, called her at least fifteen times. Harrington repeatedly told defendant that he had to have the money and that she had to come through for him. Defendant testified that she felt harassed and as though she had gotten herself into a situation where Harrington had misinterpreted her offer to make inquiries and had construed it as a promise to obtain the cocaine. She also felt sorry for Harrington, who was in serious financial trouble and was reaching out to her for help. Defendant considered Harrington to be her nephew's friend and a nice person, and she did not want to disappoint either of them. Also, shortly before April 10, Harrington offered to give defendant eight grams of cocaine, purportedly worth $2,000, if she could help him. This offer furnished defendant with an additional incentive for obtaining the cocaine, since she had very little money of her own and was living with her brother and being supported by him.

Ultimately, defendant made a second call to Longstreet, who then indicated that he thought that he might be able to obtain the cocaine. Defendant relayed this information to Harrington, and arrangements were then made for the April 10 meeting at the bicycle shop.

Defendant testified that she accompanied Longstreet to the meeting at the bicycle shop only because Harrington and Longstreet both insisted that she be present. Harrington introduced the two narcotics agents, Dixon and Berch, as his good friends and coinvestors. According to defendant, it was Harrington, and not either of the two agents, who stated that the negotiations would take place at a motel room which he had rented. Harrington said that he could not leave the bicycle shop at that time but would join the others at the motel in an hour or so. Defendant went to the motel with Longstreet and the two agents only because Longstreet had driven her to the meeting at Harrington's shop and she had no transportation of her own.

Defendant said that during the negotiations which took place at the motel room, she felt uncomfortable and wanted only to go home. She denied having ever said that she had been involved in dope deals in the past; also, she denied having offered to stay at the motel as security while Longstreet left to go get the cocaine. She recalled telling Dixon to go ahead and make the buy, but she said that she did so only because she was sick of the bickering and arguing and wanted to leave. She denied having stated that she had another cocaine source in San Fran-

cisco, and testified that she stated only that she had called some people in San Francisco in an attempt to find a supply of cocaine.

■ Defendant's first contention on appeal is that the trial court erred in denying a defense motion which was extensively argued at the commencement of the trial. At that time defense counsel informed the court that defendant intended to rely solely upon an entrapment defense and was willing to stipulate to or admit the existence of both elements of the offense with which she was charged, viz., that she had participated in the making of an offer to sell cocaine and that she had done so with the requisite specific intent. Defense counsel argued that once this stipulation or admission was made, defendant was entitled to a ruling that the prosecution was precluded from introducing any evidence pertaining to the incriminating statements allegedly made by defendant to the two narcotics agents, and which suggested that defendant had been involved in illegal drug activities in the past. Defense counsel claimed that the statements in question, including defendant's references to past "dope deals," her cocaine connection in San Francisco and her familiarity with the high quality of Longstreet's cocaine, tended to establish only that she was a bad person. He asserted that evidence of these statements was irrelevant to the issue of entrapment; further, that since defendant had offered to stipulate or admit that she had knowingly offered to sell cocaine, her incriminating statements were likewise inadmissible on that issue. The trial court denied defendant's motion and declined to exclude the statements.

Defendant's argument is based upon two recent California Supreme Court decisions, namely, *People v. Barraza* (1979) 23 Cal.3d 675 [153 Cal.Rptr. 459, 591 P.2d 947], and *People v. Hall* (1980) 28 Cal.3d 143 [167 Cal.Rptr. 844, 616 P.2d 826].

■ In *Barraza*, the California Supreme Court held that the proper test of entrapment was whether the conduct of the law enforcement agent was likely to induce a normally law-abiding person to commit the offense. (Pp. 689-690.) The court felt that matters such as the character of the suspect, his predisposition to commit the offense, and his subjective intent, were irrelevant, since the defense of entrapment was designed primarily to deter impermissible police conduct. (Pp. 690-691, fn. 5.) The court also held, however, that evidence of the transactions preceding the offense, and the suspect's response to the inducements of the officer, remained admissible on the issue of entrapment. ( P. 690.)

In *People* v. *Hall, supra*, 28 Cal.3d 143, the defendant, who was charged with possession of a concealable firearm by a felon, offered to stipulate, in the trial court, to the fact that he was a convicted felon and that he would be guilty of the offense charged if the jury found that he was in possession of a concealable firearm. (P. 151.) Having offered to so stipulate, the defendant then moved to exclude from the jury's consideration any evidence of his prior convictions. (P. 151.) The prosecution refused to accept the stipulation, and the trial court ruled that the prosecution was entitled to prove before the jury the fact that the defendant had previously been convicted of robbery. (P. 151.)

The California Supreme Court overruled a long line of California cases upon which the trial court had relied and held that the ruling constituted error.[1] The court ruled that, where a defendant offers to admit the existence of an element of a charged offense, the prosecutor must accept that offer and refrain from introducing evidence of other crimes to prove such element. (P. 152.) The court pointed out, however, that there were some narrow exceptions to their newly fashioned rule of exclusion, namely, that evidence of a fact as to which the defendant had offered to stipulate might still be admissible if (1) it was relevant to an issue not covered by the stipulation, (2) the stipulation would force the prosecution to elect between theories of guilt or hamper the coherent presentation of evidence on the remaining issues, or (3) the stipulation or admission was ambiguous or limited in scope or was intended to deprive the prosecution of the legitimate force and effect of material evidence. (Pp. 152-153.) The court concluded that none of these exceptions applied and that it had "no choice but to hold that in a prosecution for violating [Pen. Code] section 12021 the element of a prior conviction of a felony may not be given to a jury if the accused stipulates to it." (*People* v. *Hall, supra*, 28 Cal.3d 143, 156.)

While, at first blush, it may appear that *Hall* applies in this instance, we are disinclined to extend its ruling beyond the facts of that case.[2] Unlike *Hall*, this case involved the assertion of an affirmative defense, viz., entrapment. *Hall* specifically exempts from its mandate those cases

---

[1]When defendant's motion was heard and denied in the trial court, the *Barraza* case had been decided, but the *Hall* case had not. The trial court denied defendant's motion because it was of the opinion that under several pre-*Hall* appellate court decisions, the prosecution could not be forced to stipulate to an element of the offense charged.

[2]Indeed, the Supreme Court set forth its own caveat: "No opinion is expressed on the application of this rule to any other section of the Penal Code." (*People* v. *Hall* (1980) 28 Cal.3d 143, 156 [167 Cal.Rptr. 844, 616 P.2d 826].)

where the effect of the proposed stipulation is intended to deprive the prosecutor of the legitimate force and effect of material evidence. (Pp. 152-153.) Here, defendant's statements were admissible under a long established and well-recognized exception to the hearsay rule of evidence. To eliminate such testimony from the jury's consideration in the manner suggested by defendant would deprive not only the prosecutor but, more importantly, the trier of fact, of the legitimate force and effect of material evidence bearing, critically, on the credibility of the entrapment defense. Thus the evidence retains some probative value. (*People* v. *Hall, supra*, at p. 153.)

Under these circumstances, we hold that *Hall* does not apply and that the trial court was correct in its ruling that the prosecution was not bound to accept defendant's proposed stipulation.

Nor do we find any violation of the new rules governing the defense of entrapment, as set out in *People* v. *Barraza, supra*, 23 Cal.3d 675. As previously noted, the *Barraza* court held that evidence of the transactions preceding the offense and the suspect's response to the inducements of the officer *were* relevant to the issue of entrapment. (*People* v. *Barraza, supra*, at p. 690.) In this instance, it is apparent that defendant's references to her past "dope deals," her alternative cocaine connection in San Francisco, and her familiarity with the relative quality of the cocaine available from Longstreet and from defendant's San Francisco source, were made contemporaneously with and were an integral part of the negotiations leading to the sale of cocaine to the two narcotics agents. *Barraza* involved no such situation. In that case, the defendant was discredited by evidence of criminal behavior which took place years in the past. (*People* v. *Barraza, supra*, at pp. 680-681.)

Here, the statements which defendant sought to exclude were all made for the obvious purpose of inducing the agents to go ahead with the cocaine purchase. When she stated that she had always done her "dope deals this way," she was attempting to persuade agent Dixon to put up $2,000 before receiving any cocaine from Longstreet. Her evident purpose was to convince Dixon that drug transactions were commonly carried out in this manner and that he need not fear the loss of his money. Defendant's reference to her San Francisco connection and to the fact that cocaine obtained from that source was inferior to Longstreet's, likewise, was another attempt to induce the agents to make the purchase from Longstreet. These statements, showing as they did defen-

dant's willing and active participation in the drug transaction for which she was on trial, were admissible on the issue of entrapment. Thus, we cannot agree with defendant that the trial court erred in refusing to exclude such evidence.

■ Defendant contends that the trial court should have dismissed the information against her when it became apparent that Harrington would not be available to testify at the trial. She claims that Harrington's absence at the trial was due to police lapses in the preservation of evidence vital to the defense; also, she asserts that since Harrington was a police agent, his own conduct in refusing to testify at the trial amounted to a deliberate suppression of evidence by the law enforcement authorities.

Both the prosecution and the defense attempted to subpoena Harrington as a witness at the trial, but were unable to do so. During the trial, the prosecutor advised the court that he had intended to call Harrington as a witness, but had been unable to reach him and had been advised that he was ill. Later, defense counsel stated that he had been attempting to serve Harrington for almost four days and that he was aware that the prosecutor had been engaging in a similar effort. Defense counsel expressed the view that Harrington was avoiding process. However, defense counsel did not request a continuance nor did he ever indicate that Harrington's absence at the trial was a matter of concern to the defense. To the contrary, he stated that it "doesn't make any difference whether Harrington is sitting beside us here in this courtroom or not. The fact is, we can get in the testimony of Miss Allison as to what Harrington told her." Indeed, defense counsel was permitted to do so. Defendant and her nephew, Rogers, both testified at length concerning Harrington's repeated entreaties that they solve his financial problems by finding him a source of cocaine. It is evident that defense counsel was understandably happy for the opportunity to describe Harrington's entrapping behavior in detail, without fear of contradiction by Harrington. Obviously, under such circumstances, defendant is in no position to argue, for the first time on appeal, that Harrington's absence compelled a dismissal of the information. In any event, since the prosecutor was himself attempting to call Harrington as a witness, it is evident that he was in no way responsible for Harrington's absence. Also, it must be noted that Harrington did appear at a pretrial hearing and invoked the Fifth Amendment when asked if he had participated in the April 10, 1978, sale of cocaine. Thus, it is reasonable to assume that

Harrington would have declined to testify at the trial even had the parties succeeded in subpoenaing him.[3]

■ Defendant also contends that the trial court failed to make it clear to the jury that the test of entrapment was what effect the conduct of the police or their agents would have upon a normally law-abiding person "situated in the circumstances of the case at hand."

We conclude that it was not error for the trial court to reject defendant's proposed instruction containing language to that effect. As defendant herself concedes, the trial court gave the newly drafted CALJIC instructions based upon *People* v. *Barraza, supra,* 23 Cal.3d 675. CALJIC No. 4.61 (1979 rev.) states that the conduct of the law enforcement agent must be judged by the effect which it would have on a normally law-abiding person "situated in the circumstances of the case at hand." It was not necessary for the jury to hear this language more than once.[4]

■ Defendant's final contention is that the trial court erred in denying her renewed motion for dismissal due to pretrial delay.

The record reveals that defendant was released three days after her arrest on April 10, 1978. A complaint was later filed and a warrant issued on April 24, 1978, but defendant was not arrested or otherwise notified of the charges until she was rearrested on May 13, 1979, some 13 months after her initial arrest. The authorities were, at all times, aware of her correct address.

Defendant's first trial counsel, Mr. Allen, filed a motion for dismissal for pretrial delay. Following a hearing, the motion was denied. Mr. Allen based the motion upon a declaration by defendant that she had lost contact with the other parties involved in the case, did not believe that she could produce the necessary witnesses for her defense at such a late

---

[3]In arguing against defendant's claim that Harrington's absence entitled her to a dismissal of the information, the Attorney General denies that Harrington was an agent of the police. It is interesting that no such assertion was made in response to defendant's *Barraza* argument. Inferably, the Attorney General recognizes that for purposes of the entrapment defense, Harrington was, at the very least, acting in cooperation with and pursuant to the direction of Narcotics Agent Dixon. (*People* v. *Perez* (1965) 62 Cal.2d 769, 775 [44 Cal.Rptr. 326, 401 P.2d 934]; see *People* v. *McIntire* (1979) 23 Cal.3d 742, 748 [153 Cal.Rptr. 237, 591 P.2d 527].)

[4]The court also gave CALJIC No. 4.61.5 (1979 rev.).

date and also felt that the other parties who were arrested with her might now be biased and hostile to her.

Defendant subsequently changed attorneys, and her new counsel, Mr. Rockhill, sought reconsideration of the ruling on the motion, contending that Mr. Allen had furnished defendant with ineffective legal assistance on the first motion. It was claimed that Mr. Allen had failed to adequately investigate the law and the facts and had failed to demonstrate that the pretrial delay had caused actual prejudice to defendant because Harrington now took the position that he could no longer recall the circumstances resulting in the sale of cocaine on April 10, 1978. It was also claimed that defendant and her nephew, Rogers, suffered from a similar lack of recollection.

Following a hearing on this latter motion, the trial court ruled that Mr. Allen had in fact failed to behave in the manner to be expected of a reasonably competent attorney acting as a diligent advocate. However, the court also ruled that Mr. Allen's conduct had not resulted in the withdrawal of a potentially meritorious defense. Therefore, the trial court denied the motion.

It would be pure speculation on our part to assume that Harrington would have been more cooperative had the case been brought to trial more promptly. In any event, as has been noted, defense counsel's remarks at the trial clearly demonstrate that he did not consider Harrington's absence to be a disadvantage to the defense as long as defendant would be permitted (as she was) to testify to the various entreaties made by Harrington. Likewise, there is no merit to the claim that the pretrial delay resulted in impaired recollection on the part of defendant and Rogers. Both witnesses testified, in great detail, concerning the negotiations in which they had participated. Defendant has failed to demonstrate that the trial court erred in denying her renewed motion for dismissal due to pretrial delay.

The order appealed from is affirmed.

Taylor, P. J., concurred.

MILLER, J.—I respectfully dissent.

The trial court's denial of defendant's motion excluding statements of her prior involvement with drugs was error. This appears to be clear

from a reading of two recent California Supreme Court decisions, *People* v. *Barraza* (1979) 23 Cal.3d 675 [153 Cal.Rptr. 459, 591 P.2d 947] and *People* v. *Hall* (1980) 28 Cal.3d 143 [167 Cal.Rptr. 844, 616 P.2d 826].

In the *Barraza* case, the court held that the proper test of entrapment was whether the actions of the law enforcement agent was likely to persuade a normally law abiding person to commit the crime. (Pp. 689, 690.) It was concluded that conduct by the police or police agents was not permissible if it became overbearing and involved "badgering, cajoling [or] importuning . . . ." (P. 690.) The court stated that one example of such impermissible conduct was an appeal to commit the unlawful act because of friendship or sympathy. (P. 690.) An offer of exorbitant consideration was also another example of police conduct which would make the commission of the crime unusually attractive. (P. 690.) It was held that "such matters as the character of the suspect, his predisposition to commit the offense, and his subjective intent" were not relevant, since the defense of entrapment was designed primarily to deter impermissible police conduct. (Pp. 690-691, fn. 5.)

In the second case, *People* v. *Hall, supra*, the situation was one in which the defendant, who was charged with possession of a concealable firearm by a felon, offered to stipulate in the trial court to the fact that he was a convicted felon and that he would be guilty as charged if the jury found that he was in possession of a concealable firearm. After offering to so stipulate, the defendant then moved to exclude from the jury's consideration any evidence of his prior conviction. The stipulation was refused by the prosecution, and the trial court ruled that the people were entitled to prove the fact that the defendant had been previously convicted to the jury. (P. 151.)

The Supreme Court held that this ruling constituted error. It was reasoned that section 210 of the Evidence Code defines relevant evidence as evidence which tends to prove or disprove any disputed fact, and that section 350 of the Evidence Code provides that no evidence is admissible except relevant evidence. (P. 152.) The court concluded that when a fact is not genuinely disputed, evidence offered to prove that fact is irrelevant and inadmissible. (P. 152.) Hence, where a defendant offers to admit the existence of an element of a charged offense, the prosecution must accept that offer and refrain from introducing evi-

dence to prove that element. (P. 152.) The court then observed that there were narrow exceptions to this exclusionary rule, and that evidence of a fact as to which the defendant had offered to stipulate might still be admissible if 1) it was relevant to an issue not covered by the stipulation; 2) the stipulation would force the prosecution to elect between theories of guilt or hamper the coherent presentation of evidence on the remaining issues, or 3) the stipulation or admission was ambiguous or limited in scope or was intended to deprive the prosecution of the legitimate force and effect of material evidence. (Pp. 152-153.) It was held that none of these exceptions applied in a prosecution for possession of a concealable firearm by a felon and that in view of the potential prejudice to the defendant, the jury could not be apprised in any way of his stipulated status as a convicted felon. (Pp. 156-157.)

*People* v. *Hall, supra*, appears to compel the conclusion that in this instance, the trial court should have required the prosecution to accept defendant's offer to stipulate that she knowingly offered to sell cocaine: Further, that the courts should have ruled that evidence offered to prove the stipulated facts was irrelevant and therefore inadmissible, and that the evidence before the jury would be limited solely to that bearing upon the defense of entrapment. *People* v. *Barraza, supra*, appears to compel the additional conclusion that evidence of defendant's various admissions to the narcotics agents that she had been involved in illegal drug activities in the past was irrelevant and inadmissible on the issue of entrapment because the statements served only to show "the character of the suspect, [her] predisposition to commit the offense, and [her] subjective intent." (*People* v. *Barraza, supra*, at pp. 690-691.)

Attempts to defeat this reasoning, to me, are not persuasive. The Attorney General asserts that evidence of the defendant's incriminating statements to the narcotics agents was relevant and admissible because she did not rely solely upon an entrapment defense, but also denied, during her testimony, that she had made certain of the statements which the agents had attributed to her. The fatal flaw in this argument is that defendant so testified only after the trial court had ruled that it would not compel the prosecution to accept her stipulation that she had knowingly offered to sell cocaine and would permit the prosecution to offer proof of that fact, including defendant's incriminating statements to the agents. It seems clear to me that defendant denied certain of those statements only because the trial court had refused to exclude

them and to limit the evidence to that bearing upon the defense of entrapment.

It is also asserted by the People that the evidence of defendant's incriminating statements to the agents was admissible on the issue of entrapment. They are correct in pointing out that the *Barraza* court held that "the transactions preceding the offense [and] the suspect's response to the inducements of the officer" are admissible on the issue of entrapment, although evidence bearing upon the suspect's character, predisposition to commit the crime and subjective intent is not. (*People v. Barraza, supra*, at pp. 690-691.) The Attorney General contends that defendant's statements fell into the former category rather than the latter and constituted transactions preceding the offense and defendant's response to the officer's inducements. It is clear that the *Barraza* court held that evidence of this nature is admissible on the issue of entrapment *only* if such evidence is not of the type that merely bears upon the defendant's character, predisposition to commit the offense and subjective intent. I agree with the Attorney General in this instance that certain events surrounding the drug transaction were relevant and admissible on the entrapment issue. Thus, the prosecution was entitled to show such facts as defendant's apparently willing participation in the drug transaction, her statements to agent Dixon that he should go ahead with the purchase and her conduct in remaining at the motel with the officers while Longstreet went to obtain the cocaine. However, defendant's additional statements concerning her past "dope deals," the existence of an alternative cocaine connection in San Francisco and her familiarity with the relative quality of cocaine available from various sources clearly served only to demonstrate that defendant was an individual of bad character who was predisposed to commit the offense with which she was charged. It is clear that such evidence was irrelevant and inadmissible on the entrapment issue under the *Barraza* holding.

There is no reason to believe that the exclusion of defendant's statements concerning her past drug involvement would unduly hamper the presentation of the prosecution's case on the sole remaining issue of entrapment. The prosecution could attempt to defeat defendant's entrapment defense by proving that she actively participated in and encouraged the sale of cocaine. The exclusion of defendant's incriminating statements concerning her prior drug involvement would merely serve to limit the jurors' consideration to the issues properly before them and prevent them from basing their verdict upon the rationale

that if defendant had engaged in illicit drug transactions in the past, she had probably done so again. (*People* v. *Beagle* (1972) 6 Cal.3d 441, 453 [99 Cal.Rptr. 313, 492 P.2d 1].)

It would appear that the judgment of conviction should be reversed.

A petition for a rehearing was denied July 10, 1981. Miller, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied August 26, 1981.