[No. A013671. First Dist., Div. One. June 25, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
FEDERICO ANTONIO MARTINEZ, Defendant and Appellant.

**COUNSEL**

Marshall W. Krause, under appointment by the Court of Appeal, and Krause, Timan, Baskin, Shell & Grant for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Ann K. Jensen and Clifford K. Thompson, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**NEWSOM, J.**—Appellant was convicted after jury trial of two counts of sale of cocaine (Health & Saf. Code, § 11352). He has never contested his involvement in the sales, but instead relied at trial solely upon an entrapment defense. On appeal he challenges the instructions on entrapment given by the trial court.

According to the record, on July 7, 1980, Sergeant Charles Prandi of the Marin County Sheriff's office contacted Ruth Harlan, a known prostitute, who indicated that appellant might sell drugs. At the time, Harlan was not under investigation for or charged with any criminal offense, and while Prandi had communicated previously with Harlan, the record does not indicate why he contacted her on this occasion, or why she mentioned appellant's name to the officer,[1] or whether Martinez was a suspect in an ongoing investigation. A prior sexual relationship between Harlan and appellant had been discontinued after he discovered that she was prostituting on a regular basis; nevertheless, on occasion Harlan introduced him to young prostitutes for whom he had a predilection.

At Sergeant Prandi's direction, Harlan telephoned appellant from the sheriff's office at Hamilton Air Force Base, arranged to meet him at his Mill Valley home and told him that she would bring along a "beautiful" and "interested" friend. Appellant testified that, from his previous experience with Harlan, this conversation indicated to him that the friend was "available" and "desirable" for sexual purposes. Speaking of herself, Harlan also remarked to appellant that she "had it all together," which appellant interpreted to mean that Harlan would pay him back $150 she owed him as the result of a "bounced" check.

Later that day, Sergeant Prandi introduced Harlan to Jill Allen, an occasional undercover police operative who was conscripted to pose as Harlan's described friend.[2] Allen was wired for sound, given $150 in marked bills, and—inferentially—instructed to investigate appellant, and to discover whether he would sell narcotics.

Upon their arrival at his home, appellant invited Harlan and Allen inside. Harlan asked appellant if he had any narcotics, and was told he had cocaine. He then asked Harlan to accompany him to another room outside the pres-

---

[1]Harlan did not testify, having disappeared before trial.

[2]Allen was occasionally employed by law enforcement agencies—state and local—and often worked posing as a prospective patient of medical doctors who might prescribe medication without a valid basis.

ence of Allen. After a short conversation, the substance of which Allen could not hear, Harlan and appellant returned. Harlan then took the $150 from Allen, gave it to appellant, and he in turn handed Harlan three small packets of cocaine, which she gave to Allen, whom she had introduced to appellant as a childhood friend and a card dealer down on her luck.

In his defense, appellant testified that during the conversation with Harlan in his home, he was told that she would pay back her debt to him with $150 she would obtain from her friend Allen, provided appellant in turn would supply Allen with the cocaine she desired. By now, appellant had become sexually interested in Allen, but was told by Harlan that if he wanted to "score," he would have to do it "through cocaine." Appellant had the impression that Allen was "interested" in him, based upon her conduct in his home and Harlan's remarks to him about her, and so it was resolved that Allen could again contact appellant through Harlan.

On July 9, 1980, Sergeant Prandi and Allen decided to contact appellant without the assistance of Harlan, who had since disappeared. Allen went to appellant's home. When asked, appellant told Allen he had no drugs, adding, according to Allen's testimony, "that he did not like selling to somebody new." When Allen offered to prearrange matters by telephone in the future, appellant told her that, instead, she should have "Ruthie" (Harlan) call him, as he preferred to deal with her.

During this conversation, which was also tape recorded and played for the jury, appellant asked Allen if he could have a date with her, to which she responded, "not right now." Asked, "do you do dates," Allen responded, "well, not exactly." Appellant believed, however, that she was being encouraging. Allen asked appellant if she could call him, to which he responded "absolutely." In anticipation of their next meeting, and—according to his testimony—acting on the belief that supplying Allen with drugs was a prerequisite to obtaining her sexual favors, appellant purchased cocaine that evening.

Allen telephoned appellant the next day, July 10, and arranged to meet him at his home. Upon her arrival, appellant was apparently hesitant to make a drug transaction. It was not, he claimed, until Allen assured him that she would call back for a "date,"[3] that he agreed to and did sell her four packets of cocaine for $200. Both the telephone call and the conversation at appellant's home were recorded and played for the jury.

---

[3] Our perusal of the record leaves us satisfied that "date" meant sexual favors, and that Allen intended to and did suggest that she would trade sexual favors for money or drugs.

On July 14, 1980, Allen arranged in another taped telephone call to meet appellant at his home at about 6:30 p.m. When she arrived, others were present, including Steven Cowan, who testified for the defense. Appellant and Allen went into a private room, where Allen was asked to buy "a couple more grams." Appellant replied, "I don't deal dope," explaining that he wanted only to date her and cultivate her friendship. Allen said that she was not interested in dating right then. Appellant told Allen that he believed she was supporting herself by doing dates. Allen admitted to saying during this conversation that she was "on vacation now," "incognito," and "not doing a damn thing."[4] Allen eventually departed after failing to make a drug buy from appellant.

For the defense, Cowan testified that he was with appellant during Allen's July 14th telephone call and visit, at which he described her as "a little bit aloof, somewhat coy," and interpreted her evasive responses to appellant's request for a date as "sort of a lead on," although, by the end of the visit, he had begun to doubt she was a prostitute.

Allen made two further attempts to arrange transactions over the phone on September 4 and 8, 1980, but appellant refused to cooperate, stating that he did not sell drugs.

Appellant testified that he believed Allen was a prostitute from the moment they first met and that she never did anything to make him think otherwise. He testified: "Ruthie told me that this is the way to do it, give it a couple of times; then don't give her and she'll come across." Allen testified that she never represented herself as a prostitute, and exerted no pressure on appellant to furnish drugs.

I.

On appeal, Martinez first contends that the CALJIC entrapment instructions read to the jury are inconsistent with the California "objective" test of entrapment as set forth in our high court's decision in *People* v. *Barraza* (1979) 23 Cal.3d 675 [153 Cal.Rptr. 459, 591 P.2d 947]. In particular, as will be seen, he objected to the phrase "normally law-abiding person" as a part of the standard, and offered in its place the language "a person in defendant's position," which was refused by the trial court.

---

[4] On another occasion Allen had spoken of "tripping" and of doing "gigs" with conventioneers.

The trial court used CALJIC Nos. 4.60, 4.61 and 4.61.5 to instruct the jury on the law of entrapment.[5] As will have been seen, such instructions include the "normally law-abiding person" standard taken from *Barraza, supra,* wherein the court described the test for entrapment as follows: "[W]as the conduct of the law enforcement agent likely to induce a *normally law-abiding* person to commit the offense"? (*id.,* 23 Cal.3d at pp. 689-690, italics added), and further explained that: "For the purposes of this test, we presume that such a person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully. Official conduct that does no more than offer that opportunity to the suspect—for example, a decoy program—is therefore permissible; but it is impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime." (*Id.,* at p. 690.)

---

[5]According to CALJIC No. 4.60 "It is a defense to the commission of an act, otherwise criminal, that such act was induced by the conduct of law enforcement agents or officers [or persons acting under their direction, suggestion or control] when the conduct was such as would likely induce a normally law-abiding person to commit the crime.

"To establish this defense the defendant has the burden of proving by a preponderance of the evidence that the conduct of the law enforcement agents or officers [or persons acting under their direction, suggestion or control] was such as would likely induce a normally law-abiding person to commit the crime.

"Preponderance of the evidence means such evidence as, when weighed with that opposed to it, has more convincing force and the greater probability of truth.

"If you find by a preponderance of the evidence that this defense has been established, the defendant is entitled to a verdict of acquittal."

CALJIC No. 4.61 reads: "In determining whether this defense has been established, guidance will generally be found in the application of one or both of two principles. First, if the actions of the law enforcement agent would generate in a normally law-abiding person a motive for the crime other than ordinary criminal intent, entrapment will be established. An example of such conduct would be an appeal by the police that would induce such a person to commit the act because of friendship or sympathy, instead of a desire for personal gain or other typical criminal purpose. Second, affirmative police conduct that would make commission of the crime unusually attractive to a normally law-abiding person will likewise constitute entrapment. Such conduct would include, for example, a guarantee that the act is not illegal or the offense will go undetected, an offer of exorbitant consideration, or any similar enticement.

"Finally, while the inquiry must focus primarily on the conduct of the law enforcement agent, that conduct is not to be viewed in a vacuum; it should also be judged by the effect it would have on a normally law-abiding person situated in the circumstances of the case at hand. Among the circumstances that may be relevant for this purpose, for example, are the transactions preceding the offense, the suspect's response to the inducements of the officer, the gravity of the crime, and the difficulty of detecting instances of its commission."

CALJIC No. 4.61.5 reads as follows: "It is permissible for law enforcement agents or officers [or persons acting under their direction, suggestion or control] to provide opportunity for the commission of a crime including reasonable, though restrained, steps to gain the confidence of suspects but it is not permissible for law enforcement agents or officers [or persons acting under their direction, suggestion or control] to induce the commission of a crime by overbearing conduct such as badgering, coaxing or cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime."

As earlier stated, appellant's primary complaint is with the alleged unfairness of the "normally law-abiding person" standard, which he views as unfairly shifting the focus of the jury from the central issue—the character of police conduct—to an irrelevant and ambiguous inquiry into the character of the defendant. In appellant's view, the *substance* of the test announced in *Barraza* is, or should be, really, "whether a person other than one ready to commit the crime solicited" would have been induced by police conduct to violate the law.

We have carefully reviewed the decision of our high court in *People v. Barraza, supra,* 23 Cal.3d 675, from which the relevant CALJIC instructions are drawn verbatim. Notable at the outset is the uncertainty which arises from the court's express adoption of the so-called "objective" test for entrapment on the one hand, and its use of the phrase "normally law-abiding citizen" on the other, since the last-quoted phrase strongly emphasizes subjective elements, such as the predisposition of the defendant to commit the crime at issue, which shift the jury's attention from the conduct of the police to that of the defendant.

A closer analysis of the *Barraza* opinion shows, however, that it was evidently not the court's intention, nor its holding, that the objective test and concomitant focus on police conduct should be compromised by concentration upon the character of the defendant. But as we shall explain a literal adherence in the instructions to the court's language, or portions of it, regrettably imports such a compromise.

Thus, after reviewing the long-standing debate in the federal system concerning the proper test for entrapment, and endorsing the objective test finally adopted by the United States Supreme Court (cf. *Sorrells v. United States* (1932) 287 U.S. 435 [77 L.Ed. 413, 53 S.Ct. 210, 86 A.L.R. 249]; *Sherman v. United States* (1958) 356 U.S. 369 [2 L.Ed.2d 848, 78 S.Ct. 819]; *United States v. Russell* (1973) 411 U.S. 423 [36 L.Ed.2d 366, 93 S.Ct. 1637]), the court enters into an exhaustive discussion of the California precedents, and concludes that, prior to *Barraza,* the California courts, even though they "do not permit introduction of . . . highly prejudicial evidence of subjective predisposition . . . , [nevertheless improperly place a] 'limited focus on the character and intent of the accused [which] is still misplaced and impairs our courts in their task of assuring the lawfulness of law enforcement activity.'" (*People v. Barraza, supra,* 23 Cal.3d 675, at pp. 688-689.)

As if this approval of the objective test were not sufficiently explicit, the *Barraza* court then proceeded to expressly embrace Justice Traynor's dissenting opinion in *People v. Moran* (1970) 1 Cal.3d 755, 765 [83 Cal.Rptr.

411, 463 P.2d 763]: "The wording of this [entrapment] test is derived [in part] from . . . [the] dissenting opinion in *People* v. *Moran* . . . ." (23 Cal.3d 675, 689, fn. 3.)

If, however, we turn to the *Moran* decision, and in particular to the Traynor dissent, we observe that the test announced therein is that the police authority "may not engage in methods that might induce persons to commit offenses who would not otherwise do so . . . ." (1 Cal.3d 755, 765.) And, again, Justice Traynor condemns "methods of persuasion and inducement that create a substantial risk that a person *other than one ready to commit the crime solicited* will commit the crime, . . ." (1 Cal.3d at p. 765, italics added.)

It will be remarked that nowhere in his dissenting opinion does Justice Traynor use the "normally law-abiding person" standard. But the language he does apply avoids the risk—inherent in the language of the *Barraza* court—that an unintended emphasis may be placed upon the character of the defendant—a result manifestly inconsistent with the "objective" test embraced by the *Barraza* court from the use of the CALJIC instructions.

For these reasons we have concluded that, as presently phrased, the CALJIC instructions on entrapment do not accurately reflect the actual holding of the decision on which they are based. What obviously was intended by our high court, as variously restated by it in several places in the opinion, is that henceforth the test of entrapment in California would focus exclusively upon the nature and extent of police activity. (*Barraza, supra,* 23 Cal.3d 675, 689.) As presently written, however, the relevant CALJIC instructions do not ensure that the jury inquiry will be so focused, and are therefore inevitably productive of confusion.

The mischief inherent in the "normally law-abiding person" language of the CALJIC instructions is further illuminated by a decision of the Alaska Supreme Court in *Pascu* v. *State* (Alaska 1978) 577 P.2d 1064. Earlier, in *Grossman* v. *State* (Alaska 1969) 457 P.2d 226, Alaska, like California, had announced an ostensibly objective test which, however, required that police conduct be tested by its effect upon an "average person."

What the *Pascu* court said there might aptly describe the ambiguity of our test as embodied in the current CALJIC instruction: "Since announcing our decision in *Grossman* we have come to realize that there are certain difficulties in applying the foregoing standard. An 'average person' probably cannot be induced to commit a serious crime except under circumstances so extreme as to amount to duress. Yet it is clear that entrapment may occur where the degree of inducement falls short of actual duress. What is pro-

hibited, by *Grossman,* is unreasonable or unconscionable efforts on the part of the police to induce one to commit a crime so that he may be arrested and prosecuted for the offense. In determining whether entrapment has occurred, the trial court must focus 'upon the particular conduct of the police in the case presented' 457 P.2d at 226. The question is really whether that conduct falls below an acceptable standard for the fair and honorable administration of justice." (*Pascu, supra,* 577 P.2d at pp. 1066-1067.)

The wide difference between the objective and subjective standards may also be seen in the following quotation from Justice Stewart's dissenting opinion in *United States* v. *Russell, supra,* 411 U.S. 423, at page 443 [36 L.Ed.2d 366, at page 380]: "More fundamentally, focusing on the defendant's innocence or predisposition has the direct effect of making what is permissible or impermissible police conduct depend upon the past record and propensities of the particular defendant involved. Stated another way, this subjective test means that the Government is permitted to entrap a person with a criminal record or bad reputation, and then to prosecute him for the manufactured crime, confident that his record or reputation itself will be enough to show that he was predisposed to commit the offense anyway." (411 U.S. at pp. 443-444 [36 L.Ed.2d at p. 380].)[6]

Martinez was no such person as described in the instruction, and consequently was—on one view of the meaning of the instructions—debarred from asserting the entrapment defense. *Barraza,* however, reversed the conviction of a person with "a long history of drug addiction and criminal behavior" (*id.,* 23 Cal.3d at p. 691) who, like Martinez in the instant case, was also clearly a present user and purveyor of illegal narcotics.

But, had the focus in the instant case been where it belonged—that is, upon the nature and extent of the police activity—it is difficult to conceive that a jury would not have found entrapment. The use of an attractive young female undercover agent posing as an unemployed Las Vegas card dealer, introduced to appellant by a friend who was a known prostitute, and, generally, acting the part of a loose woman who might trade sexual favors for narcotics, falls far short of an acceptable standard of police conduct and constituted entrapment.

---

[6]We are aware that cases subsequent to *Barraza* have faithfully adhered to the "normally law-abiding" language of the decision, but they do so without inquiry as to whether the instruction embodying such language fairly conveys the rationale of the decision from which it was extracted. (See *People* v. *McIntire* (1979) 23 Cal.3d 742, 745 [153 Cal.Rptr. 237, 591 P.2d 527]; *People* v. *Bottger* (1983) 142 Cal.App.3d 974, 984 [191 Cal.Rptr. 408], mod. 143 Cal.App.3d 713h; *Douglass* v. *Board of Medical Quality Assurance* (1983) 141 Cal.App.3d 645, 655 [190 Cal.Rptr. 506]; *People* v. *Allison* (1981) 120 Cal.App.3d 264, 272 [174 Cal.Rptr. 481].)

For all of the foregoing reasons, we conclude that the jury was not fairly instructed on the defense of entrapment.

## II.

We turn to appellant's second assignment of error, which concerns the trial court's "presence of motive" instruction, embodied in CALJIC No. 2.51, which reads: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled." In contrast, CALJIC No. 4.61 provides, inter alia, that "if the actions of the law enforcement agent would generate, in a normally law-abiding person, a *motive for the crime* other than ordinary criminal intent, entrapment will be established." (Italics added.)

■ It will hardly be disputed that CALJIC No. 2.51 was unnecessarily and erroneously given in the case at bench. As we have seen, appellant never claimed that he did not commit the offenses, but instead relied entirely on an entrapment defense. Since defendant's commission of the proscribed acts was not in issue, it was error for the trial court to give an instruction on motive, for it had "no application to the facts of the case." (*People* v. *Rollo* (1977) 20 Cal.3d 109, 123 [141 Cal.Rptr. 177, 569 P.2d 771].) As we recently noted in *People* v. *Northrop* (1982) 132 Cal.App.3d 1027, 1040 [182 Cal.Rptr. 197]: "The jury should be instructed only upon theories and principles of law which are supported by substantial evidence."

Our high court has declared that "such an error is usually harmless, having little or no effect 'other than to add to the bulk of the charge.' [Citation.] There is ground for concern only when an abstract or irrelevant instruction creates a substantial risk of misleading the jury to the defendant's prejudice." (*Rollo, supra,* 20 Cal.3d at p. 123, quoting from *People* v. *Sanchez* (1947) 30 Cal.2d 560, 572 [184 P.2d 673].)

We conclude that the presence of motive instruction was prejudicially misleading in the case at bench. The confusion generated by the entrapment instructions, which we think caused the jury to improperly focus upon appellant's character rather than the nature of the police conduct, was compounded by adding the admonition that the jury consider motive "as a circumstance" tending to "establish guilt." From the instructions, we think it probable that the jury believed that a finding of motive would tend to negate appellant's entrapment defense.

The Attorney General argues that the instruction carried no potential for confusion or prejudice because appellant was not contesting the evidence of guilt. For precisely that reason, however, we think the instruction was particularly prejudicial. Appellant's concession that he had indeed sold Ms. Allen a controlled substance left the jury with only the entrapment issue to resolve, and the motive instruction could only have related to that sole remaining issue. And the probable effect of the motive instruction was to make the jury erroneously believe that presence of motive vitiated appellant's claim of entrapment, when in fact the creation of motive by improper police conduct is the very essence of entrapment.

The instructional error must be deemed prejudicial as it seems likely that a verdict more favorable to appellant would have resulted had the error not occurred. (*People* v. *Hannon* (1977) 19 Cal.3d 588, 603 [138 Cal.Rptr. 885, 564 P.2d 1203].) Not only did appellant rely entirely on an entrapment defense, but substantial and convincing evidence of entrapment was introduced. The conduct of the police was particularly reprehensible. And the case was a close one, with the jury deliberating for more than two days and asking that the entrapment instructions be reread.

■ While appellant did not request the motive instruction, neither did he object to it. Waiver is not indicated by the lack of an objection at trial, however. It is settled that an appellate court may review an instruction given even though no objection was made in the lower court if the "substantial rights" of the defendant are affected. (Pen. Code, § 1259);[7] *People* v. *McIntyre* (1981) 115 Cal.App.3d 899, 906 [176 Cal.Rptr. 3]; *People* v. *Arredondo* (1975) 52 Cal.App.3d 973, 978 [125 Cal.Rptr. 419].) "Substantial rights" are equated by reversible error under the standard of *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) (*Arredondo, supra,* 52 Cal.App.3d at p. 978.)

We conclude that the entrapment and motive instructions constituted prejudicial error requiring reversal.

The judgment is reversed.

Racanelli, P. J., concurred.

---

[7]Section 1259 states: "Upon an appeal taken by the defendant, the appellate court may, without exception having been taken in the trial court, review any question of law involved in any ruling, order, instruction, or thing whatsoever said or done at the trial or prior to or after judgment, which thing was said or done after objection made in and considered by the lower court, and which affected the substantial rights of the defendant. The appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

**HOLMDAHL, J.**—I respectfully dissent.

I

The majority concludes that, "as presently phrased, the CALJIC instructions on entrapment do not accurately reflect the actual holding of [*People v. Barraza* (1979) 23 Cal.3d 675 (153 Cal.Rptr. 459, 591 P.2d 947)] on which they are based," and proceeds to state "[w]hat obviously was intended by our high court" in that decision.

By so holding, the majority validates appellant's challenges both to the CALJIC instructions, which are taken verbatim from *Barraza,* and the language of *Barraza* itself.

There is little indication in *Barraza* that the court did not intend its "normally law-abiding person" language to be incorporated into jury instructions. To the contrary, that standard was used more than once in the opinion and was, in fact, emphasized by the court. While it may be true, as appellant protests, that "a court opinion is not an instruction to a jury" (*Hansford* v. *United States* (D.C.Cir. 1962) 303 F.2d 219, 222), CALJIC Nos. 460, 4.61, 4.61.5, given by the trial court, faithfully adhere to the *Barraza* test. I would accordingly hold that the CALJIC instruction on entrapment given by the trial court did not misstate the law of entrapment as enunciated in *Barraza.* (See *People* v. *Allison* (1981) 120 Cal.App.3d 264, 276 [174 Cal.Rptr. 481], where the court held that CALJIC No. 4.61 properly stated that "the conduct of the law enforcement agent must be judged by the effect which it would have on a normally law-abiding person 'situated in the circumstances of the case at hand.'")

Neither does it appear that the *Barraza* standard is flawed by its reference to the "normally law-abiding person." And, subsequent cases have faithfully and consistently followed *Barraza* in proclaiming that the proper test of entrapment is whether the conduct of the law enforcement agent was "likely to induce a normally law-abiding person to commit the offense." (See *People* v. *McIntire* (1979) 23 Cal.3d 742, 745 [153 Cal.Rptr. 237, 591 P.2d 527]; *People* v. *Bottger* (1983) 142 Cal.App.3d 974, 984 [191 Cal.Rptr. 408]; *Douglass* v. *Board of Medical Quality Assurance* (1983) 141 Cal.App.3d 645, 655 [190 Cal.Rptr. 506]; *People* v. *Allison, supra,* 120 Cal.App.3d 264, 272.)

Moreover, the majority creates uncertainty as to whether it is holding the subject instructions inappropriate in all cases or inappropriate only in cases in which the defendant, as in this case, "was no such person as described

in the instruction." Either way, what guide are trial courts now to follow in formulating their instructions? The majority provides no clear indication.

## II

I concur with the majority that the "presence of motive" instruction embodied in CALJIC No. 2.51 was unnecessarily given. I consider the effect of that instruction, however, to be comparable to that in *People* v. *Rollo* (1977) 20 Cal.3d 109 [141 Cal.Rptr. 177, 569 P.2d 771]. In *Rollo,* the court declared that "such an error is usually harmless, having little or no effect 'other than to add to the bulk of the charge.' [Citation.] There is ground for concern only when an abstract or irrelevant instruction creates a substantial risk of misleading the jury to the defendant's prejudice." (*Id.,* at p. 123, quoting from *People* v. *Sanchez* (1947) 30 Cal.2d 560, 572 [184 P.2d 673].)

I do not believe the presence of motive instruction in the case before us was prejudicially misleading. The jury was instructed to apply the instructions as a whole, and presumably did so. The giving of CALJIC No. 4.61 clearly dissociated law enforcement action or conduct from any conclusion that presence of motive under CALJIC No. 2.51 established guilt.

Moreover, no objection at trial was made to the instruction, nor was any clarifying instruction requested.

I consider the substantive effect of the error to be harmless.

I would affirm the judgment.

A petition for a rehearing was denied July 25, 1984. Holmdahl, J., was of the opinion that the petition should be granted.