UNITED STATES of America,
Plaintiff–Appellee,

v.

Brent Eugene SMITH,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Roberto Osegueya MARTINEZ,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard Leroy POPP, Jr.,
Defendant–Appellant.

Nos. 89–30309 to 89–30311.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 11, 1990.

Decided Jan. 24, 1991.

Richard D. Ness, Ronald D. Ness and Associates, Port Orchard, Wash., for defendant-appellant Smith.

Thomas W. Hillier, II, Federal Public Defender, Seattle, Wash., for defendant-appellant Martinez.

Judith M. Mandel, Mandel, Salmon & Stone, Gig Harbor, Wash., for defendant-appellant Popp.

Kenneth G. Bell, Asst. U.S. Atty., Tacoma, Wash., for plaintiff-appellee.

Before HUG, NELSON and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

In this consolidated criminal appeal, several codefendants appeal their convictions of various crimes relating to a drug conspiracy. We affirm the conviction, but vacate a part of the sentence.

## STATEMENT OF FACTS

On December 1, 1988, two weeks after a cocaine overdose, appellant Richard Leroy Popp, ("Popp"), then eighteen years old, entered Plaza Hall, a twenty-eight-day inpatient drug treatment facility in Tacoma, Washington. Popp remained at Plaza Hall Treatment Center until December 29, 1988. While in in-patient treatment, Popp met Todd Lofto ("Lofto"), a fellow patient, who claimed to be a rock singer. Lofto and Popp became friends and while in treatment together, frequently discussed drugs and the distribution of drugs. According to Popp's testimony at trial, he was not a dealer in cocaine; Popp participated in these discussions and exaggerated his knowledge of drug dealing only in an effort to make Lofto like him.

In late December of 1988, Lofto contacted Drug Enforcement Administration Special Agent Greg Gassett ("Agent Gassett") offering to act as an informant. The DEA told Lofto he might receive payment for his work as an informant, and in early January Lofto was debriefed and signed up.

According to Popp, Lofto asked Popp in January about whether he could arrange cocaine deals; Popp claims he replied that he could not, because he did not know anyone. In January Lofto introduced Popp to Agent Gassett as a person who could arrange large cocaine deliveries, the purpose of the meeting being to arrange a one-kilogram purchase of cocaine. Agent Gassett knew that Popp had been in a drug treatment program with Lofto. According to Popp, Lofto told Popp to pretend that some kind of a deal was going to go through, and Popp agreed to help Agent Gassett purchase some cocaine. According to the Government, the deal broke down

because Popp's dealer refused to participate.

Lofto continued asking Popp to try to find a connection for Agent Gassett and himself. Popp claims that Lofto promised him money and a place to live, and that Lofto got angry when Popp tried to back out. Popp also claims that he was reluctant, but continued to talk with Agent Gassett to please Lofto and did attempt to put together a deal. According to the Government, Popp made five separate attempts to arrange the cocaine transaction, the last of which resulted in his arrest.

On March 13, 1989, Brent Smith contacted Agent Gassett at a number Agent Gassett had previously supplied to Popp. In this taped conversation, Smith told Agent Gassett that he and Popp could arrange for the delivery of one kilogram of cocaine from Popp's hairdresser "Todd," later identified as Todd Renstrom ("Renstrom"), whom Popp had spoken with. Popp's name was mentioned throughout the call. Popp claims that he was promised money for helping arrange the deal and was later promised some cocaine.

The following day, March 14, 1989, Agent Gassett spoke with Popp in the morning and again in the afternoon. In these taped conversations, Popp confirmed that the deal could take place and gave Agent Gassett the pager number of "Mike," later identified as defendant Michael Kancianich ("Kancianich"), who was to be Agent Gassett's cocaine source.

That evening, Agent Gassett contacted Kancianich at a second number left on Agent Gassett's pager in reply to his call to the first number. Agent Gassett and Kancianich negotiated the cocaine transaction; Kancianich stated that he wanted Renstrom, not Popp, at the delivery. The delivery was set for 7:30 p.m. in the restaurant/coffee shop of the Executive Inn in Fife, Washington. Popp's name was repeatedly mentioned in these calls. Agent Gassett then contacted Popp, and told him of Kancianich's desire to have Renstrom, not Popp, at the delivery, and to contact Kancianich.

Agent Gassett then contacted Kancianich, and told Kancianich that he had reached Popp, that Popp would call Kancianich, and that Popp would arrange for Renstrom to be present at the delivery. Gassett and Kancianich then further negotiated the price. Popp's name was repeatedly mentioned during this call. Agent Gassett then again contacted Popp after Popp had spoken with Kancianich, and Popp told Agent Gassett that he had spoken with Kancianich and everything was set. Agent Gassett and Popp then discussed testing the cocaine for purity and the price.

On March 15, 1989 Agent Gassett contacted Renstrom. Agent Gassett and Renstrom finalized arrangements for the cocaine purchase that evening: Renstrom was to meet Kancianich at 6:30 p.m. and together they would meet Agent Gassett at the Executive Inn restaurant/bar at 7:30 p.m. Popp's name was mentioned repeatedly during this call.

Agent Gassett arrived at the lounge at the designated time and observed two individuals involved in suspicious activity which he believed to be counter-surveillance. The two were later identified as Carl Kerns ("Kerns") and Thomas Wusterbarth ("Wusterbarth"). Agent Gassett ultimately made contact with Renstrom, who invited him out to the parking lot to a car where the transaction would take place.

Kancianich met Renstrom and Agent Gassett at Renstrom's car. Inside the car, the cocaine was shown to Agent Gassett. There was one kilogram of cocaine. A signal was given, and Kancianich and Renstrom were arrested. At the time of his arrest, Kancianich was armed with a gun. In addition, a loaded handgun was found in the glove compartment of the car.

Kerns and Wusterbarth were also arrested at the scene based upon the observations of Gassett. Following arrest, Kerns admitted to being the source of Kancianich's cocaine. He consented to a search of his house where another kilogram of cocaine and $46,000 were discovered. (Count 9). He agreed to place a phone call to Martinez. The two agreed to meet in a parking lot, presumably where Kerns

would give Martinez money for the cocaine. Martinez arrived at the parking lot at the designated time and was arrested. His pager was seized.

After these arrests, Agent Gassett called Smith and Popp, suggesting that they meet him to obtain some of the cocaine he had "received." Upon their arrival, Popp entered the restaurant and was arrested. According to the Government, at the arrest Popp stated that he had assisted Agent Gassett by introducing him to cocaine dealers in an effort to become a "big time drug dealer." Smith was arrested outside in the vehicle that he was driving. Agent Gassett previously had communicated with defendant Smith ("Smith") during a phone call on March 13th, when Agent Gassett returned a call as a result of a telephone page. A tape recording of that phone call of March 13, 1989 was entered into evidence at trial.

On April 14, 1989, the Grand Jury for the Western District of Washington returned a multi-count indictment. The indictment charged Martinez, Popp, Smith and others with drug and gun violations. Four of the charged defendants reached plea agreements before the trial date.

On May 19, 1989 Popp filed a motion for disclosure of the identification and whereabouts of Lofto, the informant. The Government agreed to provide pretrial access, but due to the arrest of Lofto on unrelated charges, this became impossible. Popp's counsel was notified, and counsel interviewed Lofto at his place of confinement.

On July 13, 1989 Popp filed a motion to dismiss the indictment, alleging that the Government violated his right to due process by engaging in outrageous conduct. On July 18, 1989, trial for Martinez, Popp, and Smith began. Popp filed an Application for Writ of Habeas Corpus Ad Testificandum as to Lofto, who was incarcerated in a state institution within the district court's territorial jurisdiction, contending that Lofto was necessary both at the hearing on Popp's motion to dismiss based on Government misconduct and at trial to supply information relevant to his entrapment defense. Following argument the trial court denied Popp's motion to dismiss.

On July 19, 1989 the trial court denied Popp's application for the writ and the prosecution commenced its case. Following the prosecution's case, Popp renewed his motion to dismiss and application for writ of habeas corpus ad testificandum; both were denied. In Popp's trial defense Popp's girlfriend, Tina Campbell, testified that Lofto dominated Popp and that Lofto called Popp almost daily from January through March of 1989. Popp also testified on his own behalf. During the trial Popp requested an entrapment instruction, which the trial judge refused; Popp excepted to the court's failure to instruct the jury on entrapment and excepted to the court's instruction (the Government's Proposed Instruction No. 10) on the use of undercover agents.

On July 25, 1989, the jury returned verdicts of guilty against defendants Martinez, Popp, and Smith on all counts in which they were named.

## ANALYSIS

### I. SUFFICIENCY OF EVIDENCE SUPPORTING SMITH'S CONVICTIONS.

On July 25, 1989, the jury found Smith guilty of:

Count 1 Conspiracy to Distribute 500 Grams or More of Cocaine; 21 U.S.C. §§ 846 and 841(b)(1)(B);

Count 2 Unlawful Use of Communication Facility; 21 U.S.C. §§ 843(b) and 843(c); and

Count 6 Possession With Intent to Distribute of 500 Grams or More of Cocaine; 21 U.S.C. §§ 841(a) and 841(b)(1)(B).

In this appeal, Smith challenges the sufficiency of the evidence supporting these convictions.

■ Smith is foreclosed from arguing this issue. As the government points out in its brief, Smith did not preserve this issue on appeal because he failed to raise it at the district court level. *United States v. Harden*, 846 F.2d 1229, 1232 (9th Cir.1988); *United States v. Curtis*, 568 F.2d 643, 647 (9th Cir.1978). This court may review the

sufficiency of the evidence only to prevent a "manifest miscarriage of justice." *United States v. Curtis*, 568 F.2d at 647.

■ Assuming, *arguendo*, that the issue were not foreclosed, Smith's argument is meritless. We must review the evidence in the light most favorable to the government and determine whether a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *United States v. Harden*, 846 F.2d at 1232.

The evidence amply supports the jury verdict finding Smith guilty of conspiracy to distribute cocaine, and contains substantial evidence of coordinated activity among the defendants.[1] Such coordinated activity can raise a reasonable inference of a joint venture. *United States v. Hernandez*, 876 F.2d 774, 778 (9th Cir.1989). The evidence also clearly supports the jury verdict on Count 2, unlawful use of a communication facility. Smith testified that he knew that his telephone conversations with Agent Gassett were "part of a cocaine deal."

Smith's responsibility for Count 6, possessing with intent to distribute, is based on coconspirator responsibility. There is no doubt that Smith's coconspirators were guilty of Count 6. The evidence also indicates that Smith knew that his coconspirators possessed cocaine and intended to distribute it. Sufficient evidence supported Smith's convictions on all counts, and the jury could reasonably have found Smith guilty on all counts.

## II. MARTINEZ'S TITLE 18 U.S.C. § 924(c) CONVICTIONS.

■ Martinez argues that the district court erred by imposing consecutive terms for two Section 924(c)(1) violations based on the same underlying offenses. We agree.

Section 924(c)(1) provides that

Whoever, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years.

We, along with other circuits, have required that each section 924(c)(1) charge be based on a separate predicate offense. *United States v. Fontanilla*, 849 F.2d 1257, 1259 (9th Cir.1988); *United States v. Henry*, 878 F.2d 937 (6th Cir.1989); *United States v. Henning*, 906 F.2d 1392, 1399 (10th Cir.1990). Here, although two different guns were the basis for the two section 924(c)(1) counts, both counts were based on the same two predicate offenses: conspiracy to distribute cocaine and possession with intent to distribute. In count seven, the indictment charged Martinez for Renstrom's possession of a .45 caliber handgun in relation to the count one charge (conspiracy to distribute cocaine) *and* the count six charge (possession with intent to distribute). In count eight, the indictment charged Martinez with another section 924(c)(1) violation for the .38 caliber handgun found in the glove compartment of Renstrom's car and used *the same two counts*, counts one and six, as the basis for that offense. Because each 924(c)(1) count must be supported by a separate predicate offense, Martinez can only be convicted of one 924(c)(1) offense. Martinez' conviction

1. "To prove a conspiracy, the government must show (1) an agreement, (2) to engage in criminal activity and (3) one or more overt acts in furtherance of the conspiracy." (Citation omitted) *United States v. Hernandez*, 876 F.2d 774, 777 (9th Cir.1989). The testimony of Agent Gassett and the tape recorded conversation between Agent Gassett and Smith support the guilty verdict on the conspiracy charge; Smith told Agent Gassett that "Ricky" (Popp) had met with someone from whom he had received a haircut (Renstrom), and had received a call saying that the deal could go "anytime you guys are ready." Smith explained that this deal didn't involve "Andrew," with whom another previous attempt had failed to produce results, but involved "Todd" [Renstrom], who "gets it from a Mexican" [Martinez]. Smith then told Agent Gassett the price was $21,000.00, but that "it will probably drop after a couple." Gassett then told Smith to tell Popp he could do the deal on Wednesday, and to "tell him to beep me tomorrow at noon." Smith reassured Agent Gassett that this deal would succeed, whereas others had failed, stating that "it sounds pretty for sure." After his arrest, Smith stated that he had become involved as a way to make money, and that he had hoped to make $600.00 for his efforts.

on count 8 is accordingly vacated.[2]

## III. ADMISSION OF DRIVER TESTIMONY.

Martinez claims that the trial court erred by admitting the testimony of codefendants Amy Driver and Rick Driver over objections that the testimony was irrelevant and prejudicial. Amy and Rick Driver both testified to their drug transactions with Martinez during and prior to the alleged conspiracy. They also testified that they saw money, drugs, and guns in Martinez's possession. Amy Driver was called by the government and testified that she had been the girlfriend of Martinez since 1986. She testified that when she met him, he worked at a farm and was not involved in drug dealing. On the other hand, she admitted she was a drug addict at the time she met Martinez. She went on to testify that Martinez ultimately became a drug dealer. She said he supplied her, her brother and many others with drugs. Over objection, she testified about alleged dealings between Martinez and others who were not part of the transactions leading to the indictment.

The district court's construction of the Federal Rules of Evidence is a question of law subject to de novo review. Questions of the admissibility of evidence which involve factual determinations, rather than questions of law, are reviewed for an abuse of discretion. *United States v. Owens*, 789 F.2d 750, 753 (9th Cir.1986) (citations omitted), *reversed on other grounds*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988).

The testimony of Amy and Rick Driver concerning events during the time frame of the alleged conspiracy are directly relevant to proving the existence of the charged conspiracy. It shows that Martinez conspired with others, including Amy Driver, to distribute cocaine. The testimony concerning events prior to the conspiracy probably was irrelevant and inadmissible. However, given the testimony regarding acts during the conspiracy, the prior acts probably did not affect the verdicts. We affirm the district court's admission of the evidence because the evidence did not "more likely than not" affect the verdict. *See United States v. Emmert*, 829 F.2d 805, 808 (9th Cir.1987).

## IV. ENHANCEMENT OF MARTINEZ'S SENTENCE.

Martinez was sentenced under the Sentencing Guidelines. The court adjusted his base offense level upwards by four based on United States Sentencing Commission, *Guidelines Manual* § 3B1.1(a) (Nov.1989). U.S.S.G. § 3B1.1(a) instructs the court to increase the defendant's offense level by four "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive...."

Martinez argues that U.S.S.G. § 3B1.1(a) should not have been applied to his case because, although there were five people involved in this case, Martinez did not play a managerial or supervisory role in the offense. The trial court's factual determination that Martinez was an "organizer or leader" is reviewed for clear error. *United States v. Carvajal*, 905 F.2d 1292, 1295 (9th Cir.1990).[3]

Martinez was the source of cocaine for codefendant Kern who in turn supplied the cocaine to codefendant Kancianich. Kern was acting as a manager of the cocaine distribution business for Martinez. According to the testimony of Amy Driver,

---

**2.** We reverse on count 8 rather than count 7 because it is unclear whether Renstrom was in actual or constructive possession of the .38 caliber gun.

**3.** Martinez argues that the clearly erroneous standard of review is called into question by *United States v. Anderson*, 895 F.2d 641, 644 (9th Cir.1990). However, *Anderson* held that a clearly erroneous standard applies to the trial court's factual determinations regarding a defendant's role in the offense. *Id.* Martinez appears to be arguing that his level of participation was insufficient to make him an organizer or leader, and that at most he was a supervisory middleman. Thus, his role in the offense centers around the resolution of factual determinations. On this point, the district court's decision should be reviewed for clear error. *Carvajal*, 905 F.2d at 1295.

Martinez also used her to distribute cocaine. From these facts, the conclusion that Martinez acted as an organizer of the criminal activity was not clearly erroneous.

Martinez also argues that U.S.S.G. § 3B1.1(a) does not apply to his case because he did not directly manage all five codefendants in this case. He contends that to receive an adjustment under U.S.S.G. § 3B1.1(a), the defendant must directly supervise the five or more participants. This is a legal question that is subject to de novo review. *Carvajal*, 905 F.2d at 1294.

On its face, § 3B1.1(a) does not require a defendant to personally supervise each participant. The section simply states that an adjustment occurs if a defendant was an "organizer or leader of a criminal activity that *involved* five or more participants...." U.S.S.G. § 3B1.1(a) (emphasis added). A participant is any person who is criminally responsible for the offense even if not convicted. U.S.S.G. § 3B1.1(a), comment. (n. 1). The commentary, note 3, also recognizes that there can be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy, which clearly cuts against Martinez's argument. Here, Martinez organized the cocaine distribution ring that eventually involved five people. Consequently, the adjustment of Martinez's offense level by four was proper.

## V. POPP'S APPLICATION FOR A WRIT OF HABEAS CORPUS AD TESTIFICANDUM.

The denial of a writ of habeas corpus ad testificandum is reviewed for abuse of discretion. *United States v. Owen*, 580 F.2d 365, 368 (9th Cir.1978).

Popp first contends that the district court erred in denying his Application for a Writ of Habeas Corpus Ad Testificandum as to Lofto, the informant. Specifically, he contends that the court abused its discretion by failing to state its reasons for its denial of his application, in spite of Popp's assertions regarding the importance of Lofto's testimony contained in his counsel's affidavits. The Government maintains that the court did not abuse its discretion, because Lofto's testimony was unnecessary.

Courts have generally required criminal defendants requesting such writs to comply with Fed.R.Crim.Proc. 17(b), which looks for "a satisfactory showing ... that the presence of the witness is necessary to an adequate defense." *See, e.g., United States v. Rinchack*, 820 F.2d 1557, 1567 (11th Cir.1987). This Court has adopted the following standard on necessity:

> If the accused avers facts which, if true, would be relevant to any issue in the case, the requests for subpoenas must be granted, unless the averments are inherently incredible on their face, or unless the Government shows, either by introducing evidence or from matters already of record, that the averments are untrue or that the request is otherwise frivolous.

*United States v. Sims*, 637 F.2d 625, 627 (9th Cir.1980) (quotation omitted).

The court may also consider whether testimony would be cumulative, *United States v. Henry*, 560 F.2d 963, 965 (9th Cir.1977), and the difficulties in securing a prisoner's testimony versus the actual need for such testimony. *Rinchack*, 820 F.2d at 1568. Furthermore, unsupported and conclusory claims are not sufficient to show error. *United States v. Bottom*, 469 F.2d 95, 95 (9th Cir.1972) (per curiam). The burden of proving necessity is on the defendant. *Rinchack*, 820 F.2d at 1566–67; *United States v. Wyman*, 724 F.2d 684, 686 (8th Cir.1984).

Popp requested Lofto's testimony to show: (1) Lofto was a DEA informant; (2) Lofto met Popp while in drug treatment; (3) Lofto recruited Popp by inducement; and (4) Popp was not predisposed to commit these acts. The first two reasons for Popp's request were already established by prior undisputed testimony; hence, Lofto's testimony as to these facts was not necessary. While the latter two reasons relate to Popp's entrapment defense, no proffer as to the inducement or Lofto's personal knowledge as to Popp's subjective lack of predisposition was made; rather Popp sim-

ply made unsupported and conclusory claims.[4] Thus, the district court did not abuse its discretion in denying Popp's application.

## VI. POPP'S MOTION TO DISMISS.

■■■ Popp next contends that the district court erred in denying his motion to dismiss due to outrageous Government conduct. Specifically, he contends that the use of an informant who exploited his vulnerability and emotional dependence, and the invasion of the sanctity of a treatment environment constitutes outrageous conduct. The Government maintains that the district court did not err, as the courts have upheld Government conduct far more onerous than that in the present case.

■■■ A denial of a motion to dismiss an indictment based on claims of outrageous Government conduct involves a question of law and is reviewed de novo. *United States v. Citro*, 842 F.2d 1149, 1152 (9th Cir.1988).

■■■ For a due process dismissal, the Government's conduct must be so grossly shocking and so outrageous as to violate the universal sense of justice. *United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir.1983); *Citro*, 842 F.2d at 1152. The Government's involvement must be *malum in se* or amount to the engineering and direction of the criminal enterprise from start to finish. *Citro*, 842 F.2d at 1153. The police conduct must be "repugnant to the American system of justice." *Shaw v. Winters*, 796 F.2d 1124, 1125 (9th Cir.1986) (quoting *United States v. Lomas*, 706 F.2d 886, 891 (9th Cir.1983), *cert. denied*, 464 U.S. 1047, 104 S.Ct. 720, 79 L.Ed.2d 182 (1984)). In short, a defendant must meet an extremely high standard.

The courts have upheld all of the following: Use of false identities by undercover agents, *Shaw*, 796 F.2d at 1125, and *United States v. Marcello*, 731 F.2d 1354, 1357 (9th Cir.1984); the supply of contraband at issue in the offense, *Hampton v. United States*, 425 U.S. 484, 489, 96 S.Ct. 1646, 1649–50, 48 L.Ed.2d 113 (1976); the commission of equally serious offenses by an undercover agent as part of the investigation, *United States v. Stenberg*, 803 F.2d 422, 430 (9th Cir.1986); the introduction of drugs into a prison to identify a distribution network, *United States v. Wiley*, 794 F.2d 514, 515 (9th Cir.1986); the assistance and encouragement of escape attempts, *United States v. Williams*, 791 F.2d 1383, 1386 (9th Cir.), *cert. denied*, 479 U.S. 869, 107 S.Ct. 233, 93 L.Ed.2d 159 (1986); use of a heroin-using prostitute informant whose own activities were under investigation and who engaged in regular intercourse with the defendant, *United States v. Simpson*, 813 F.2d 1462, 1465–71 (9th Cir.1987).

Although drug agents' encouraging 18–year–old patients in drug-treatment centers to deal drugs is not the most constructive enforcement method, it does not rise to the level of outrageous conduct necessary to constitute a due process violation. Here, Popp showed a tendency for dealing drugs independent of any action on the part of the DEA: Popp met with Lofto and discussed drugs and drug distribution with him prior to Lofto's DEA affiliation. Moreover, there is no evidence supporting Popp's claim that the Government exploited Popp's alleged dependence on Lofto. In fact, notwithstanding Popp's testimony to the contrary, there was evidence that Popp, not Lofto, was the driving force behind the drug discussions and transaction. Thus, the district court properly denied Popp's motion to dismiss the indictment.

## VII. POPP'S REQUESTED JURY INSTRUCTION ON ENTRAPMENT.

■■■ Popp last contends that the district court erred by refusing to give his requested jury instruction on entrapment. Specifically, Popp contends that he presented sufficient evidence at trial to create a jury question on the entrapment issue. The Government maintains that the district court did not err, because the evidence

---

**4.** The Government also notes that the other issues on appeal are conclusively disposed of based upon Popp's own testimony and undisputed facts in the record. Therefore, Lofto's testimony cannot be "necessary."

presented, even from Popp himself, was insufficient to permit a reasonable trier of fact to find this defense.

In order to establish entrapment a defendant must show that he was (1) induced to commit the crime by a Government agent and (2) not otherwise predisposed to commit the crime. *United States v. Goodacre*, 793 F.2d 1124, 1125 (9th Cir.1986). For the court to instruct on an entrapment defense, the defendant must present some evidence of both elements. *United States v. Busby*, 780 F.2d 804, 806 (9th Cir.1986). If a defendant is predisposed to commit a crime, an entrapment defense is unavailable, regardless of the inducement. *Hampton v. United States*, 425 U.S. 484, 488–89, 96 S.Ct. 1646, 1649–50, 48 L.Ed.2d 113 (1976); *United States v. Moncini*, 882 F.2d 401, 406 (9th Cir.1989).

The inducement must be provided by someone then acting in a Government capacity. *See, e.g., id.* at 1125; *United States v. Busby*, 780 F.2d 804, 806–07 (9th Cir.1986); *United States v. Brandon*, 633 F.2d 773, 778 (9th Cir.1980). A finding of predisposition can follow consideration of factors such as:

(1) the character or reputation of the defendant, including any prior criminal record;

(2) whether the suggestion of the criminal activity was initially made by the Government (less important);

(3) whether the defendant engaged in the criminal activity for profit;

(4) whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion (most important); and

(5) the nature of the inducement or persuasion supplied by the Government.

*United States v. Smith*, 802 F.2d 1119, 1124–25 (9th Cir.1986); *Busby*, 780 F.2d at 807; *United States v. Reynoso–Ulloa*, 548 F.2d 1329, 1336 (9th Cir.1977), *cert. denied*, 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978).

Popp contends that the inducement in the present case was the promise of pecuniary gain. However, as Popp testified, this profit was to be derived from the transaction itself through the resale of a portion of the cocaine, not a prior inducement. Furthermore, Popp admits that in the later stages of the transaction, he was not even in contact with Lofto.

Popp contends that his lack of prior drug convictions and his self-admission into a treatment center evidence good character, and that by his own testimony he was reluctant to go forward with the deal, but by his own testimony and that of his girlfriend he did so because of Lofto's influence over him. However, Agent Gassett's testimony portrayed Popp as an eager participant, and Popp himself admitted that he wanted the deal to go through, intentionally deceived Kancianich and Renstrom to further the deal, and acted as a communications relay between the various principals. Popp also admitted a three-gram-a-week cocaine addiction for the two years prior to his overdose, that he told Lofto of having big drug connections, and that after treatment he had several drug-related contacts with Lofto. Moreover, Popp admitted that his major reason for participation in the transaction was his plan to sell part of the cocaine to his long-time supplier, whom he lived with upon his graduation from the treatment center. Thus, Popp failed to show inducement and lack of predisposition, and the district court properly denied Popp's proposed entrapment instruction.

AFFIRMED IN PART AND VACATED IN PART.