Filed 10/3/23  P. v. Manso CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JESUS MIGUEL MANSO,<br><br>        Defendant and Appellant. | A163114<br><br>(Del Norte County<br>Super. Ct. No. CRF219110) |

Defendant Jesus Manso pled no contest to a single felony count of meeting with a minor for a lewd purpose (Pen. Code, § 288.4, subd. (b)), and subsequently moved to dismiss the case on the ground the government engaged in outrageous conduct toward him in violation of his due process rights.  (See *U.S. v. Russell* (1973) 411 U.S. 423, 431-432.)  The due process claim was based upon the actions of the fictitious victim of Manso's crime, who was an adult decoy posing online as an underage girl.  The trial court denied the motion, and he now appeals.

It is unnecessary to address the claimed due process violation.  We conclude that Manso received ineffective assistance of counsel in pleading no contest to the charge, because it is reasonably probable that had he gone to trial and asserted the defense of entrapment at least one juror would have voted to acquit him.  We reverse the judgment.

1

# BACKGROUND

## A. General Legal Principles

Under California law, the use of decoys to expose illegal activity is generally lawful. (*Provigo Corp. v. Alcoholic Beverage Control Appeals Bd.* (1994) 7 Cal.4th 561, 568 (*Provigo*).) If the conduct of government officials does no more than offer a suspect the opportunity to commit a crime, the defendant may not assert the defense of entrapment. (*Ibid.*; *People v. Barraza* (1979) 23 Cal.3d 675, 690 (*Barraza*).)

Under state law, the line is crossed into entrapment when a decoy engages in overbearing conduct, such as pressure, badgering, cajoling, importuning or other acts, to such an extent that the overbearing conduct is likely to induce an otherwise law-abiding person to commit a crime. (*Provigo*, *supra*, 7 Cal.4th at p. 569.) Examples include actions that would induce a normally law-abiding person to commit the crime for some motive distinct from ordinary criminal intent, such as making appeals to friendship or sympathy. (*Barraza, supra,* 23 Cal.3d at p. 690.) Another example is official conduct that makes commission of the crime "unusually attractive" to a normally law-abiding person, such as by guaranteeing the offense will go undetected. (*Ibid.*)

A nongovernmental decoy is an agent of law enforcement for purposes of the entrapment defense if the decoy acts " 'at the request, suggestion, or direction' " of law enforcement officials. (*People v. Federico* (2011) 191 Cal.App.4th 1418, 1423; see also *People v. McIntire* (1979) 23 Cal.3d 742, 748 ["manipulation of a third party by law enforcement officers to procure the commission of a criminal offense by another renders the third party a government agent for purposes of the entrapment defense"].)

The test for entrapment under state law is objective:  it asks whether the conduct of law enforcement is likely to induce a normally law-abiding person to commit the crime, regardless of the suspect's own subjective intent or predisposition to commit the offense.  (*Barraza*, *supra*, 23 Cal.3d at pp. 689-691.)  The focus is on police conduct, not the suspect's subjective state of mind or character.  (*Id*. at pp. 690-691.)  Police conduct must be "'judged by the effect it would have on a normally law-abiding person situated in the circumstances of the case at hand," including circumstances such as "the transactions preceding the offense, the suspect's response to the inducements of the [decoy], the gravity of the crime, and the difficulty of detecting instances of its commission."  (*Id*. at p. 690.)  Under federal law, by contrast, the entrapment defense is subjective; it does not protect a suspect who is predisposed to commit the crime anyway but applies " 'only when the [g]overnment's deception actually implants the criminal design in the mind of the defendant.' "  (*Hampton v. U.S.* (1976) 425 U.S. 484, 489.)

Independent of the (non-constitutional) defense of entrapment, there is an open question concerning whether, and/or the extent to which, federal due process principles constrain police conduct in the operation of undercover operations.  Both the United States Supreme Court and the California Supreme Court have left open the possibility that sufficiently outrageous police misconduct might violate a target's right to due process of law and "absolutely bar the government from invoking the judicial process to obtain a conviction."  (*U.S. v. Russell*, *supra*, 411 U.S. at pp. 431-432; see also *People v. Smith* (2003) 31 Cal.4th 1207, 1224-1225; *People v. Guillen* (2014) 227 Cal.App.4th 934, 1002-1012 (*Guillen*) [summarizing authorities].)  Because California's entrapment defense is broader than its federal counterpart, there is an unresolved split of authority among appellate courts

3

as to whether a due process claim of outrageous police conduct is "superfluous" to California's entrapment defense. (See *Smith*, 31 Cal.4th at pp. 1225, 1227 [discussing authorities and declining to decide the issue]; compare *People v. Thoi* (1989) 213 Cal.App.3d 689, 696 [holding defense of outrageous police conduct "does not exist separately within the context of entrapment cases"] with *People v. Holloway* (1996) 47 Cal.App.4th 1757, 1767 [disagreeing with *Thoi*].)

### B. "Jess"

Manso's encounter with the decoy began in September 2020, when he carried on a text exchange with someone posing as a 14-year-old girl named Jess, who in fact was a volunteer with an organization called Worldwide Predator Hunters (WWPH). At some point, WWPH brought the situation to the attention of a deputy sheriff with the Del Norte County Sheriff's Office, Deputy Asbury. In an incident report, Deputy Asbury described WWPH as a group that "assist[s] in identifying and collecting evidence on persons who sexually exploit minors they contact online through different social media applications." Deputy Asbury wrote that "I was working [the] case with WWPH and was advised that Manso was text messaging a 14 year old female decoy named 'Jess' . . . . Attempts were made by Manso to meet 'Jess' and carry out sexual acts however Manso did not arrive at the determined location and stopped communicating with 'Jess.' "

The record contains an incomplete log of their text communications. Very few are of a sexual nature. In most, Manso repeatedly expresses reluctance to break the law, a fear of getting caught and a desire to wait until "Jess" is older to meet her, and he apologizes repeatedly for hurting her feelings. He professes to her that he wants to take care of her and marry her one day, tells her "u are so beautiful as an angel," says he wants to spend the

4

rest of his life with her, and pleads with her for permission to just keep their exchanges limited to texts until she is older. "Jess" responds by assuring him repeatedly they will not be caught, accusing of him of getting her excited "for nothing," playing games and wasting her time, and declining to stay in touch with him as he would like. The texts end with Manso asking "Jess" for her address and telling her he was "really scared going to underage girl house." As noted in the incident report, Manso stopped communicating with "Jess" and that is where things ended.

### C. "Ally"

About six months later, on March 21, 2021, Manso was using an adult dating chatroom called Skout when he initiated contact with someone described as an 18-year-old woman, who in fact was the same WWPH volunteer who had previously posed as "Jess." This time, the volunteer identified himself as "Ally."

Manso introduced himself, told "Ally" he was single and looking for a long-term relationship and asked if she wanted to meet him. "Ally" then told him she was 14 years old. Manso asked why she was on the dating site and whether her parents knew. She told him no and that he could text her directly, and she promised not to tell anyone they were texting if he also promised. Then the two dropped off the Skout application and resumed their communications directly through text.

Manso expressed a desire to meet "Ally" and told her he was 30 years old, and "Ally" said she did not care. She asked if her age was a problem for him, and he said it was not. Later, he asked her if she wanted a boyfriend, asked her to be his girlfriend and to come to Crescent City someday to meet him. When he asked for her photograph, the decoy sent him a photograph of

5

an adult female and he told her she was "gorgeous." Then their messages turned sexual, all initiated by him.[1]

Later that night, Manso told "Ally" he loved her and asked her if she loved him. She asked how he could have feelings for someone he just met to which he responded, "Because u are the only that didn't ask me to send u money, and didn't ask me to buy u a gift card."

The next day, March 22, he continued texting with "Ally," again telling her how beautiful she was, asking her to be his girlfriend, professing his love to her, telling her he wanted to make out with her and that he would never leave her alone. He again expressed interest in meeting her and offered to rent a hotel room so they could meet, and also invited her to come to his house to spend the night with her. And he continued to be sexually explicit with her, including to the point of asking her take off her pants and masturbate. But then, he told her that if they were caught they'd both get in trouble and so they should wait until "Ally" turned 18.

At some point the same day (March 22), the founder of WWPH contacted Deputy Sheriff Asbury. He informed the deputy sheriff that Manso was engaged in texting a 14-year-old female decoy and the texts had become sexual and provided the chat logs to the sheriff's office.[2]

---

[1] For example, he asked if she would want to make out and do some naughty things, including touching "[b]etween our legs" "Like I touch u on ur pussy," and he talked about feeling horny, and initiated a conversation about her touching herself. He also told her he was touching his penis while they were texting and asked if she wanted to touch it.

[2] The record contains a summary of their texts but only a few pages of the actual texts.

Manso carried on texting "Ally" for four more days, until he was arrested at his home on March 26 after making plans, and expecting, to meet "Ally" there that day.

Here is what the record shows took place between Manso and the decoy after law enforcement had been contacted:

On either March 23 or March 24, Manso again offered to rent a hotel room but then said he wanted to wait until "Ally" was older because it would be weird for a "little kid" to go his hotel room. He offered to pay for a taxi to take her to his house and continued to engage in sexually explicit texts with her.

A portion of their text exchange is in the record:

"[Ally]: aww lol too bad they dnt got ubers up here cuz those r cheaper then taxis.

"[Manso]: Ik but i want to just wait until u are older because it going be weird a little kid going to a hotel room.

"[Ally]: i dnt look like a lil kid i look older cuz of my glasses n lip ring

"[Manso]: Okay someday we can do it i save money for the hotel room

"[Ally]: how much does it cost

"[Manso]: Idk yet just wait until i have enough money to get the hotel room

"[Ally]: aw does ur job like not pay u much."

A portion of their exchange about 40 minutes later (beginning around 6:20 pm) also is in the record:

"[Ally]: oh cool i get fridays off too

"[Manso]: Wat time on Friday

"[Ally]: i cant go if my moms not working

7

"[Manso]: Wat days dose she work [¶] I can come to u someday if u want and i can rent a room for both of us

"[Ally]: okay mayb further down the road we can do the hotel thing

"[Manso]: Okay when u get older if u be okay with that

"[Ally]: yea i jus said i am

"[Manso]: Like when u are 18

"[Ally]: yea if we keep gettin along like we r now :)

"[Manso]: When u 18 we can get a hotel room together

"[Ally]: that won't b for a long time haha but sure

"[Manso]: I will always wait for u

"[Ally]: id b down for friday as long as my moms working

"[Manso]: I want to wait because i don't [want] u to get in trouble

"[Ally]: i wont as long as my mom is at work

"[Manso]: Can we just wait until u get older if u be okay with that

"[Ally]: r u changing ur mind

"[Manso]: Yes if u okay with that

"[Ally]: ok hmu wen im 18

"[Manso]: Are u okay with that

"[Ally]: why wudnt i b?

"[Manso]: I was wondering if u be mad

"[Ally]: i mean u went from saying u wanna hang out in 3 days to like 3 and a haf years u make no sense

"[Manso]: I just [don't] want us to get caught and we both will get trouble so i want to wait until u are 18 if u [be] okay with that

[¶] . . . [¶]

"[Ally]: watever jus tex me in like 3 n a half years

"[Manso]: U don't want to text anymore

"[Ally]:  we can tex if u want

"[Manso]:  Yes i do because i don't want u to be mad

"[Ally]:  im not mad ppl change there minds it is wat it is

"[Manso]:  Sorry [¶] Ik right

"[Ally]:  yea i may go for a walk

"[Manso]:  I wish i was walking with you

 "[Ally]:  me too lol can we stop talkin bout our wishes hehe jus cuz i dnt like thinkin bout doing stuff i cant do

"[Manso]:  Enjoy ur walk text me when u can okay

"[Ally]:  k brb my mom got home ima go talk to her

"[Manso]:  Ok

"[Ally]:  hey"

On March 25, which was either one or two days later (the record is unclear), the two made plans to meet at Manso's home on March 26.  Manso texted "Ally" with directions to his house, said he would pay for her bus fare, and told her that when she came they would go into his bedroom, lock the door, make out and "touch each other."  Again, a portion of their texts from that day are in the record:

"[Ally]:  watever u want

"[Manso]:  Are you there

"[Ally]:  yea we cud kiss n stuff

"[Manso]:  Make out

"[Ally]:  yea we hav ben over this lol

"[Manso]:  I just want to know if u be okay with it

 "[Ally]:  i said i was okay with it, tho

"[Manso]:  No sex yet right

"[Ally]:  welllll i said that we cud kiss n touch n"

9

The next day, the decoy carried on their text exchange, pretending to be traveling to Manso's home. When Manso stepped outside to look for her, Deputy Asbury, who had been parked outside, arrested him.

When interrogated by Deputy Asbury, Manso initially expressed ignorance as to why he had been arrested and, although he admitted messaging "Ally," stated he didn't do anything wrong and was sorry if he had done so. He also denied intending to have sexual intercourse with "Ally" because she was only 14 but admitted he had planned to engage in other sexual touching (of their genital areas). Once Deputy Asbury confronted him with the chat logs of his prior conversations with "Jess," he admitted knowing that what he was doing with "Ally" was wrong, having directed "Ally" to delete their conversations so nobody would know they were talking and having intended to engage in the sexual acts as planned had "Ally" actually arrived at his home as expected.

### D. Proceedings Below

Manso was charged with a single count of meeting with a minor for the purpose of engaging in lewd or lascivious behavior (Pen. Code, § 288.4, subd. (b)) and entered a plea of no contest. At the plea hearing, defense counsel stated he intended to bring a motion to dismiss the case in the interest of justice after the probation department filed its report.

Subsequently, the probation department filed a report expressing concerns about the case because Manso is intellectually disabled, and obviously so.

According to the probation report, Manso is a 31-year-old, 325-pound man who lives with his father and has been diagnosed as having a mild intellectual disability, for which he has been receiving services from a

10

regional center. He was bullied as a high school student, has no friends, and has never had a girlfriend. He has no prior criminal history.

Manso told his probation officer he knew he had sent inappropriate text messages to the decoy and should not have done so and knew he should not have continued to text her. He pointed out he had told her multiple times to wait until she was 18 years old. But he said he felt pressured and did not want to hurt anyone's feelings or have anyone feel like he was playing games with them. He made a written statement to the same effect: "I know this was wrong, but I messed up and texted her sexual stuff to [*sic*] underage person, but I thought she was 18 at first, [and] when she said she was 14 I wanted to stop but she kept pushing to meet me at my house."

The probation officer wrote that he had "concerns" about the case. He explained that "[a]fter interviewing the defendant face to face and speaking with him at length, the impact of his disability is apparent." He wrote that the interview "was more akin to interviewing a first time juvenile offender, not a thirty-one year old man" and that it was "readily apparent" in the interview that Manso "is operating mentally, emotionally and maturity [*sic*] at the level of maybe a thirteen year old." The probation officer also said that this was also apparent "if the totality of the text messages in the current offense are looked at via an objective lens," explaining that Manso's grammar, vocabulary and "form" of communicating in the texts was "very immature." He said that if someone who was "neutral" and ignorant of Manso's age read the text exchanges with "Ally," Manso (and the decoy) would "most likely" be mistaken for "two young adolescent[s]."

The probation officer acknowledged the felonious nature of Manso's conduct and was "in no way attempting to excuse" it, but also "question[ed]" whether Manso would have continued to carry on with the text exchanges

11

with "Ally" had he not been intellectually disabled. He explained: "On multiple occasions both in the current offense and the recorded interactions in 2020 [with "Jess"], the defendant told the decoys that what they were doing was wrong and they needed to wait until they were eighteen. In both instances the decoy responded with snide, baiting, and aggressive texts that almost bordered on pressuring and almost bullying the defendant into continuing the interaction, in particular accusing the defendant of 'playing games,' and 'wasting her time.' . . . . [H]is responses [to these texts] again display his intellectual disability and low functioning maturity. The defendant stated during his interview that he did not want to hurt anyone's feelings or . . . make them think he was playing some kind of game, and that he felt pressured to continue the contacts with [the] [decoys] after he tried to backtrack."

The probation officer also wrote that he had concerns about Manso's ability to understand and comply with the terms of probation, because he was unsure if Manso "truly" understood the consequences of failing to comply with the terms of probation and the sexual offender registry. He wrote that the concerns were based principally on the many questions Manso had asked about the judicial process and the roles and functions of the various people involved in it.

Nonetheless, the probation department recommended Manso be held accountable for his actions, which he knew were wrong, and serve 180 days in jail and placed on supervised probation for two years.

After receipt of the probation report, defense counsel filed a sentencing memorandum requesting dismissal of the case on due process grounds, arguing that the tactics used by the decoy, in combination with defendant's intellectual disability, were outrageous.

At the sentencing hearing held on July 15, 2021, defense counsel expressly disclaimed—twice—that Manso had been entrapped and said that was in fact the reason he did not take the case to trial. Nevertheless, the due process theory of "outrageous conduct" he articulated was in substance an entrapment theory.[3] The court expressed the view that "it's clearly not entrapment." And the prosecutor agreed ("it's definitely not entrapment"). Later, though, the court expressed the view that "the heart of this is entrapment," because state officials, in "collusion" with WWPH, were "making a person who is not likely to commit a crime commit a crime." When the court expressed a concern there was insufficient evidence the decoy was acting in coordination with the sheriff's office to support an entrapment defense, defense counsel asked for a continuance in order to subpoena Deputy Asbury. After further argument, the trial court implicitly denied both the motion to dismiss and defendant's request for a continuance and proceeded directly to sentencing.

The court suspended imposition of sentence and placed Manso on two years of probation, including 180 days of jailtime. This appeal followed.

## DISCUSSION

Manso initially raised two issues on appeal.

He argued, principally, the trial court erred in denying his motion to dismiss the case at the sentencing hearing. He asserted the evidence

---

[3] Defense counsel argued it was "abundantly clear" Manso "had second thoughts about actually doing this" and yet the decoy was "just trying to badger him into staying into it just for a bust." The decoy, he argued, "made it very clear that they didn't want him to back out of it" and in both incidents (posing both as "Jess" and "Ally"), "responded with snide, baiting, aggressive texts" that "bordered on pressuring, almost bullying the defendant into continuing the interaction." He argued Manso "clearly wanted to back out of that situation" and was just "text[ing] because he's lonely."

13

established both that the decoy was sufficiently connected to the sheriff's department that it was acting as the government's agent in the conduct of the sting operation and that those actions were sufficiently outrageous to warrant dismissal of the charges against him on due process grounds. Second, he argued that if the record is insufficient to establish that the decoy was acting as an agent of the government, then the trial court abused its discretion in denying his request for a continuance to allow him to subpoena Deputy Asbury to establish that fact.

After we received the parties' briefs, we appointed new appellate counsel for Manso and sought supplemental briefing as to whether the record on direct appeal is sufficient to establish whether he received ineffective assistance of counsel by pleading no contest to the charge under Penal Code section 288.4 rather than assert an entrapment defense under state law. Having considered the supplemental briefing, we conclude that it is. Accordingly, we do not address Manso's due process claim.[4]

## I.

" '[T]he negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel.' "

---

[4] As noted, the viability of the outrageous government conduct doctrine in California is unsettled. (*Guillen*, *supra*, 227 Cal.App.4th at p. 1007.) Assuming the doctrine exists in California, it is narrow, and Manso acknowledges this ("few cases rise to this level"). (See *People v. Fultz* (2021) 69 Cal.App.5th 395, 431 ["California Courts of Appeal occasionally have concluded that outrageous government conduct merited dismissal of criminal charges"].) That is because "[f]or a due process dismissal, the [g]overnment's conduct must be so grossly shocking and so outrageous as to violate the universal sense of justice." (*U.S. v. Smith* (9th Cir. 1991) 924 F.2d 889, 897; see *Rochin v. California* (1952) 342 U.S. 165, 172-173 [due process violated where law enforcement conduct "shock[ed] the conscience," and recognizing government must "respect certain decencies of civilized conduct"].)

(*Missouri v. Frye* (2012) 566 U.S. 134, 141.)  A defendant challenging a plea on the basis of ineffective assistance of counsel is governed by *Strickland*'s two-part test (*Hill v. Lockhart* (1985) 474 U.S. 52, 58-59 (*Hill*)):  the defendant must demonstrate that his counsel's performance "fell below an objective standard of reasonableness" and that prejudice resulted. (*Strickland v. Washington* (1984) 466 U.S. 668, 688 (*Strickland*).)

## II.

We first address the reasonableness of defense counsel's decision not to assert the defense of entrapment.

An entrapment instruction is warranted if substantial evidence supports the defense (*People v. Watson* (2000) 22 Cal.4th 220, 222; *Barraza, supra*, 23 Cal.3d at p. 691) and here, the decoy engaged in conduct that could support such a defense.

A rational jury could conclude the decoy was an agent of the sheriff's department.  Deputy Asbury's own statements described WWPH as a group that "assist[s] in identifying [suspects] and collecting evidence" for the sheriff's department and described the decoy as having "work[ed] a separate case" with the sheriff's department concerning Manso when posing initially as "Jess."  There also is evidence of social media posts by the sheriff's department announcing the arrests of two other individuals that resulted from an investigation carried out "with the help of" WWPH.  And then there are the actual circumstances:  Deputy Asbury was provided with copies of Manso's texts with "Ally" four days before arresting Manso and the texts were allowed to continue thereafter, thereby creating an inference of the deputy's tacit approval of the decoy's conduct and of ongoing involvement and coordination between the two.  Deputy Asbury also used evidence procured from the decoy during the custodial interrogation of Manso, confronting

15

Manso with the text logs of his prior exchange with "Jess" to extract statements about Manso's consciousness of guilt concerning "Ally." (See, e.g., *People v. Allison* (1981) 120 Cal.App.3d 264, 269-271, 276, fn. 3 [informant who offered to introduce police to people selling cocaine, subsequently interacted with defendant and implored her to procure cocaine for him, and then arranged for police to meet and arrest defendant acted "in cooperation with and pursuant to the direction of" police for purposes of entrapment defense]; see also *People v. Perez* (1965) 62 Cal.2d 769, 775 [entrapment instruction warranted if there is evidence third party was "acting in cooperation with the authorities"], citing *Sherman v. U.S.* (1958) 356 U.S. 369.)

A rational jury also could conclude the decoy exploited Manso's loneliness and pressured him to such a degree that the decoy's conduct was likely to wear down the reluctance of someone like Manso to engage in illegal conduct with a minor. At multiple junctures, Manso expressed unwillingness to proceed until "Ally" turned 18. But "Ally" twice implied they would not get caught. And after several expressions of petulance and adolescent hints at annoyance when Manso tried to desist, and one innuendo professing her sexual appetite for him, he made plans to meet her at his home, where he was arrested. Under these circumstances, a rational jury could conclude that a normally law-abiding person in Manso's shoes would have been induced to commit the crime. Several federal authorities, although not binding, are persuasive on this point.[5]

---

[5] See *U.S. v. Poehlman* (9th Cir. 2000) 217 F.3d 692, 698-703 [lonely and depressed adult held entrapped into committing sex crimes with minors where decoy posing as adult woman on adult dating site "played on [defendant's] obvious need for an adult relationship" by exploiting his fear of rejection by her and urging him to have sex with her imaginary daughters as

16

Also relevant is Manso's diminished mental capacity. (Cf. *Barraza, supra*, 23 Cal.3d at p. 690 [for purposes of entrapment defense, law enforcement's conduct must be "judged by the effect that it would have on a normally law-abiding person *situated in the circumstances of the case at hand*," italics added]; cf. *U.S. v. Sandoval-Mendoza* (9th Cir. 2006) 472 F.3d 645, 656 [evidence "that a medical condition renders a person unusually vulnerable to inducement is highly relevant to an entrapment defense"] [federal law].) As Manso argues, based on the content of his texts, it must have been apparent to the decoy that he had the intellectual and emotional maturity of a teenage boy. And we agree that, as such, this meant he was more vulnerable than an adult to suggestive tactics (*In re Elias V.* (2015) 237 Cal.App.4th 568, 578) and less able to engage in logical reasoning and control his impulses (*Atkins v. Virginia* (2002) 536 U.S. 304, 318).

In sum, a rational jury could conclude that a decoy working in conjunction with law enforcement knowingly exploited the diminished capacity of someone operating at the intellectual and psychological maturity

---

a condition of her continued interest in him] [applying federal law]; *Bradley v. Duncan* (9th Cir. 2002) 315 F.3d 1091, 1095-1098 [jury should have been instructed on entrapment defense given evidence defendant purchased cocaine out of sympathy for visibly ill drug addict in withdrawal who begged for drugs] [applying California law]; see also *People v. Federico, supra,* 191 Cal.App.4th at p. 1424, fn. 4 [discussing both cases]; *Guillen, supra,* 227 Cal.App.4th at pp. 1004, 1007 [noting persuasive weight of federal authorities on this issue]; see also *People v. McIntire, supra,* 23 Cal.3d at p. 747 [entrapment instruction warranted, given evidence undercover agent constantly pressured high school student to procure drugs, who in turn constantly pressured his sister who acquiesced out of sympathy for brother's family problems]; cf. *People v. Fromuth* (2016) 2 Cal.App.5th 91, 96, 104, 112 [no evidence supporting entrapment instruction where defendant engaged in no significant communication with decoy posing as a minor other than to arrange a one-time sexual rendezvous in response to decoy's ad].)

17

of a teen by playing on his sympathies to lure him into committing an offense he was not otherwise inclined to commit, and that would not be a crime were he actually a teen (see *People v. Fromuth, supra,* 2 Cal.App.5th at p. 106). That is entrapment.

Although an appellate court must not speculate as to whether defense counsel had a tactical reason for engaging in a course of conduct, "[w]hen the record on direct appeal clearly illuminates the reasons for the attorney's challenged conduct and the attorney is afforded an opportunity to explain, reviewing courts are ' "in a position to intelligently evaluate whether counsel's acts or omissions were within the range of reasonable competence." ' " (*People v. Zaheer* (2020) 54 Cal.App.5th 326, 336 [finding no tactical basis for defense counsel's conduct on direct appeal, based upon consideration of his own statements in the record].)

Here, the record clearly illuminates there was no tactical reason for defense counsel to waive an entrapment defense by advising Manso to plead guilty. Had defense counsel taken the case to trial, there was more than sufficient evidence to warrant an instruction on the defense. Yet at the sentencing hearing, defense counsel explained that the only reason he had *not* taken the case to trial was because he didn't think there *was* a viable entrapment defense. He also alluded to the possibility of an ineffective assistance of counsel claim based on his failure to assert an entrapment defense, and even said he might raise such a claim on appeal. That concession "provides us with rare insight into counsel's own evaluation of his conduct" on direct appeal. (*People v. Zaheer, supra,* 54 Cal.App.5th at p. 336.) In these circumstances, counsel's performance was objectively deficient.

18

## III.

When a defendant has pled guilty rather than gone to trial, "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." (*Hill, supra,* 474 U.S. at p. 59.)

Manso argues he was prejudiced by counsel's deficient performance because there is a reasonable probability he would have been acquitted had the jury been presented with an entrapment defense. By contrast, the People argue Manso cannot establish prejudice on direct appeal because the record is not sufficient to establish that but for counsel's deficient representation there is a reasonable probability that he would have insisted on going to trial rather than plead guilty. The People posit that Manso "could have chosen to plead no contest for myriad reasons, including to avoid the embarrassment of a trial."

We agree with Manso. In the first place, defense counsel's remarks at the sentencing hearing reflect that the *only* reason Manso pleaded no contest was because defense counsel mistakenly saw no basis for an entrapment defense.

Second, the People misconceive the nature of the prejudice inquiry. In *Hill*, the United States Supreme Court explained that "In many guilty plea cases, the 'prejudice' inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial." (*Hill, supra,* 474 U.S. at p. 59.) And it provided guidance on the very issue before us now. It explained that "where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, *the resolution of the 'prejudice' inquiry will depend*

19

*largely on whether the affirmative defense likely would have succeeded at trial.*" (*Ibid.*, italics added.)  The Court also stressed "these predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the 'idiosyncrasies of the particular decisionmaker.'" (*Id.* at pp. 59-60.)

Here, it is reasonably probable that the entrapment defense would have succeeded had it been presented to a jury because it is reasonably probable that *at least one juror* would have voted to acquit Manso.[6]  We need look no further than the comments of Manso's probation officer, who was extremely troubled by the case yet felt compelled by the duties of his office to recommend probation.  The trial judge also acknowledged that it appeared to be a classic case of entrapment.  Given the fact that two unbiased professionals with responsibilities for the administration of criminal justice had misgivings about the circumstances of this case, it does not take any leap of logic or conjecture to conclude it is reasonably probable at least one lay person sitting on the jury would too.  It is therefore reasonably probable counsel's deficient performance affected the outcome of this case.  It was prejudicial.

## DISPOSITION

The judgment is reversed.

---

[6]  Both parties agree that a hung jury is a more favorable outcome than a conviction for purposes of demonstrating prejudice under *Strickland*.

_____

STEWART, P.J.

We concur.

_____

RICHMAN, J.

_____

MARKMAN, J.*

*People v. Manso* (A163114)

---

\* Judge of the Alameda Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21